[52 NE3d 1114, 33 NYS3d 88]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SEAN JOHN, Appellant.

Argued February 10, 2016; decided April 28, 2016

*Lynn W.L. Fahey, Appellate Advocates*, New York City (*Dina Zloczower* of counsel), for appellant.

*Kenneth P. Thompson, District Attorney*, Brooklyn (*Sholom J. Twersky* and *Leonard Joblove* of counsel), for respondent. ■

*Wilmer Cutler Pickering Hale and Dorr LLP*, New York City (*Julia C. Pilcer* of counsel), *Wilmer Cutler Pickering Hale and Dorr LLP*, Boston, Massachusetts (*Felicia H. Ellsworth* and *Reuven Dashevsky* of counsel), *Seth Miller, Innocence Network*, Tallahassee, Florida, and *Innocence Project*, New York City

(*Dana M. Delger, David Loftis, M. Chris Fabricant* and *Susan Friedman* of counsel), amicus curiae.

**OPINION OF THE COURT**

Chief Judge DiFiore.

On this appeal, we address whether defendant's Sixth Amendment right to confront the witnesses against him was violated when the People introduced DNA reports into evidence, asserting that defendant's DNA profile was found on the gun that was the subject of the charged possessory weapon offense, without producing a single witness who conducted, witnessed or supervised the laboratory's generation of the DNA profile from the gun or defendant's exemplar. We conclude that, under the circumstances presented here, defendant's right to confrontation was violated.

I

Defendant was involved in an altercation just outside of his apartment building, during which he pointed a gun at complainant. Defendant's neighbor, the ground floor resident of the three-story, multifamily brownstone, witnessed the encounter and called the police. When the police arrived and investigated, defendant was arrested. Defendant's neighbor advised the responding officer that she had seen defendant go into the building's basement with something in his hand. She indicated the door to the basement was the one across from her apartment.

The officer entered the basement through a latched but unlocked door. The basement was unlit and unfurnished, with

dirt on the floor, and, although apparently used for storage, it did not have any areas designated for particular tenants. The officer searched the basement using his flashlight and found a blue box marked "Smith & Wesson," which he recognized as "the same box that [his] firearm came in." He opened the box, which contained a loaded 9 millimeter handgun and an extra magazine. When later shown the gun, complainant identified it as the same one defendant had pointed at him.

The gun was secured and an officer from the evidence collection team took three swabs from the gun to test for the presence of DNA. The officer prepared a written request for a laboratory examination on the evidence, with defendant listed as the arrestee. This report, along with the swabs, was submitted to the Department of Forensic Biology of the New York City Office of Chief Medical Examiner (OCME), plainly stating that the specific reason for the requested analysis was "PERP HANDLED THE FIREARM."

Using PCR (polymerase chain reaction) DNA typing, the scientific reliability of which, if performed correctly, is not in issue, the lab found the presence of a single source male DNA profile on swabs from the gun. The combination of the DNA alleles found in the sample would be expected to be found in approximately "1 in greater than 1 trillion people." The PCR DNA typing analyzes DNA in the form of alleles that are found at the same location (locus) of the DNA on homologous (matching) chromosomes. A person has two different alleles at a particular locus. OCME tests for 15 specific short tandem repeat (STR) locations (loci) and the amelogenin locus, which is used to determine the sex origin of the sample. The STR alleles are identified by the number of core repeats present at the locus. Experienced analysts convert these numeric identifiers into a DNA profile using machine-generated raw data analyzed by a software program and the analyst's independent manual examination which involves an editing process (see John M. Butler, Fundamentals of Forensic DNA Typing at 213 [2010]).

In this case, on February 5, 2010, analyst "CJB" completed the electropherogram that graphically depicted the peaks of the DNA analysis and a handwritten editing sheet for the DNA typing of the gun swabs and exported the 16 loci DNA profile from the gun swabs into a spreadsheet. On February 16,

analyst Melissa Huyck[1] issued a report containing defendant's name and arrest number and stating that the 16 loci profile was developed through PCR analysis and that a comparison of the DNA profile recovered from the gun could be done upon submission of an oral swab from a suspect. Upon defendant's indictment, the People, in April 2010, moved pursuant to CPL article 240 for a court order to take defendant's DNA by buccal swabs. The same officer who had swabbed the gun collected buccal swabs from defendant in September 2010. On September 20th, and again in a retest on the 24th, the lab generated a 16 loci DNA profile from defendant's exemplar. Analyst "CS" was involved in the two generations of the same DNA profile from the exemplar, initialing both of the edit tables, the electropherogram and the allele table—another spreadsheet containing the generated DNA profile. The DNA profiles are printed in a simple series of 15 pairs of numbers and the XY sex designation. In a table resembling a box score, dated October 1, 2010, and initialed by Huyck (MAH), the two DNA profiles generated from the gun swabs and the exemplar were listed in "identifier loci order" and "CODIS loci order." The series of numbers were identical.

Prior to trial, defendant moved to suppress the firearm. Defendant maintained that he had standing based upon a reasonable expectation of privacy both in the gun box and in the basement from which the gun was recovered, that there was no exigency permitting the warrantless search for a gun since he was already under arrest at the time of the search of the basement and that the officer did not obtain the neighbor's consent to search the shared basement. After a suppression hearing, the court denied the motion, concluding that the neighbor had consented to the search of the basement, that defendant had no objective privacy interest in the basement and that once the officer was lawfully in the basement and "he saw the firearm it was appropriate for him to seize it."

Defendant also moved prior to trial to either preclude the People from introducing the OCME laboratory reports certify-

---

**1.** The lab casefile also contains a DNA Profile Evaluation Form reflecting that Huyck checked the generated profile against the local OCME database, which is not to be confused with the national or state CODIS (Combined DNA Index System) database and which produced no match. The form also indicates that the DNA profile from the gun was reviewed not by Huyck but by another analyst who did an evaluation of the associated data and the positive and negative controls.

ing the DNA test results into evidence, or require each analyst who had tested the DNA to testify at trial. Defendant cited *Bullcoming v New Mexico* (564 US 647 [2011]), *Melendez-Diaz v Massachusetts* (557 US 305 [2009]) and *People v Brown* (13 NY3d 332 [2009]) in support of his argument that it would violate his Sixth Amendment right to confrontation to introduce the DNA evidence through a surrogate expert who had not performed, witnessed or supervised the DNA testing of the samples. The court denied the motion.

At trial, the People called the analyst Huyck as an expert in forensic biology and DNA analysis. She testified that she was an OCME Criminalist Level II within the Department of Forensic Biology and that the Department was predominantly responsible for examining and testing items from crime scenes for DNA analysis. When the People sought to introduce the OCME files containing the DNA laboratory reports and test results (exhibits 6A [DNA report on the gun swabs] and 6B [DNA report on the suspect's exemplar]) as certified business records through Huyck, defense counsel conducted a voir dire examination of the witness. Huyck testified as to the stages necessary to generate a DNA profile and agreed with defense counsel's statement that an analyst does not just "put a piece of paper in the machine and it does all of the work for you." Rather, as Huyck explained, the sample is unpacked and subject to four stages of DNA testing: extraction (to release the DNA from any cells), quantitation (to determine how much DNA was present), amplification (to make millions of copies of the specific locations, or loci of the DNA, to be tested) and then, "running a sample on a DNA instrument." In this final stage, the analyst uses an electrophoresis instrument and a sophisticated software program (GeneMapper ID in this case) to produce an electropherogram, which graphically depicts the peaks of the DNA analysis, and conducts an interpretive analysis to compile the numerical DNA profile that is used for comparison.[2]

---

**2.** The premise that DNA typing and the generation of the DNA profile is software driven and needs no independent manual evaluation by the trained analysts is both unsupported by the record, including Huyck's testimony and the laboratory reports detailing the editing process attending the generation of the DNA profiles, and scientifically unsound. This meritless premise is also quite contrary to standard laboratory protocols including OCME's protocols for the GeneMapper ID used in this case. Any claim that the machine-generated results from the gas chromatograph test admitted into

Huyck testified that, according to OCME policy, due to the volume of their workload, different analysts perform each stage and that various controls and duplicate tests were conducted to ensure that the results were accurate and reliable. With respect to the gun swabs, Huyck testified that she opened the package containing the swabs, cut portions of each swab and put them into a tube. She neither conducted nor witnessed nor supervised any part of the DNA testing on the gun swabs that followed. By Huyck's count, the four-stage process involved six other analysts. Based on the reports for the four-stage process on defendant's exemplar, Huyck, who was, again, not involved in the testing, estimated that aside from the two analysts who did the cutting of the sample, there were eight more analysts involved.[3] Significantly, one analyst and one reviewer provided the reports for each of the two DNA profiles generated using the electrophoresis instrument and the software program on the gun swabs and the exemplar.

At the end of the voir dire, defendant renewed his objection to allowing the laboratory reports into evidence. He asserted that the reports were testimonial and that under *Bullcoming* the analysts who had performed the DNA tests had to be produced for cross-examination. The court overruled the objection and allowed the reports into evidence. The People also submitted, over defendant's objection, the table depicting the two generated DNA profiles (exhibit 7) as 15 pairs of numbers and the XY sex determinations. While the exhibit was displayed to the jury, Huyck opined that the two obviously identical series of numbers, represented in box score form, were a match and that the source of the two DNA profiles were the gun and defendant. Huyck's opinion as to the comparative match of the two identical DNA profiles is not at issue.

On cross-examination, Huyck testified that she had reviewed the laboratory reports "to make sure that everything looked okay and everything was signed off on by the necessary people." Defendant then inquired about the electropherogram from

---

evidence in *Bullcoming* required more independent evaluation and less skill, specialized knowledge and training than a DNA analyst generating a DNA profile is similarly scientifically unsound.

**3.** The lab reports for defendant's exemplar state that there was an electrophoresis failure involving a dropout of alleles in all samples (including defendant's exemplar) at the same loci so, for quality control, the samples were all reamplified and run again in the electrophoresis instrument in order to generate the DNA profile. This may explain why there were two more analysts used for defendant's exemplar.

exhibit 6A, pertaining to the gun swab results. Huyck testified that the electropherogram was "a fancy name for DNA results" and that the chart looked like "a bunch of peaks," with each peak representing "one of the numbers" used to identify the alleles. Peak heights are important in the analysis and Huyck explained that, on occasion, the results would contain "artifacts" which she defined as—"just little peaks that actually aren't from the sample itself." When these peaks appear, it is necessary for the analyst to engage in an editing process, which is accomplished through the use of a filter in the software program or by the testing analyst after the "data comes off the instrument." In the latter instance, an analyst along with a reviewing analyst will remove a peak, known as a "stutter," if it "is below 20 percent of the actual peak." She testified that "in this case [as to the gun swabs] there were two or four peaks taken out in the stutter position." Huyck, who did not engage in the editing process, claimed that she "did review [the results of the editing to] make sure that [she] agreed that that edit, that artifact should have been taken out." The "Forensic Biology - Editing Sheet" for the gun swabs contained handwritten notes, initialed by the testing analyst and the reviewing analyst, neither of whom was Huyck. The report noted pull ups, nonspecific artifacts and four stutters in the testing of the sample from the gun swabs. The very same analyst who initialed the editing sheet for the gun swabs also initialed the "PROFILE GENERATION TABLE" setting forth the 16 loci DNA profile, as well as the electropherogram.

Defendant was convicted of criminal possession of a weapon in the second degree and menacing in the second degree. The Appellate Division affirmed, concluding that suppression was properly denied, with one Justice concurring in the result (120 AD3d 511 [2d Dept 2014]). A Justice of the Appellate Division granted defendant leave to appeal (24 NY3d 1005 [2014]). We now reverse.

## II

As a preliminary matter, defendant's arguments concerning the warrantless search and seizure are only partially preserved. There is record support for the affirmed finding that, based on the neighbor's conduct, the officer was authorized to search the basement (see e.g. People v Leach, 21 NY3d 969, 971-972 [2013]; People v Adams, 53 NY2d 1, 8 [1981]). Moreover, once the officer saw the Smith & Wesson box in plain view, he was

authorized to seize it (*see People v Brown,* 96 NY2d 80, 88-89 [2001]; *People v Diaz,* 81 NY2d 106, 110-111 [1993]). Defendant failed to argue to the suppression court, as he does now, that once the officer located the gun box, he was unable to open it because he could not be sure that the Smith & Wesson box contained a gun (*see People v Graham,* 25 NY3d 994, 996 [2015]; CPL 470.05 [2]). Although the Appellate Division went on to address the legality of the officer's subsequent search of the gun box, since that specific argument was not raised to the suppression court, it is beyond our review (*see People v Vasquez,* 66 NY2d 968, 970 [1985]).

Defendant's remaining argument is that the admission into evidence of the laboratory reports violated his Sixth Amendment right to confrontation. Preliminarily, there is no dispute that DNA evidence is powerful forensic evidence in determining either the guilt or the innocence of an accused. The DNA profile evidence in this case was used as substantive evidence to prove defendant's guilt, as it directly linked him to the loaded gun that was found in a box in the basement. As the accused in a criminal prosecution, defendant has the right to be confronted with the witnesses "who bear testimony against him" (*see Melendez-Diaz,* 557 US at 309 [internal quotation marks omitted], quoting *Crawford v Washington,* 541 US 36, 51 [2004]). Therefore, "[a]s a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness" (*Bullcoming,* 564 US at 657). Statements that are considered testimonial include "affidavits, . . . similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (*Crawford,* 541 US at 51-52 [internal quotation marks and citations omitted]). Forensic evidence reports admitted into evidence for proving the truth of the matter asserted are not exempt from the Confrontation Clause under *Crawford* and its progeny.

In *Melendez-Diaz,* the Court concluded that notarized certificates of forensic analysis—stating that a substance seized from the defendant was cocaine—were testimonial as the report was created to serve as evidence in a criminal proceeding. The Court determined that the certificates were "functionally

identical to live, in-court testimony" and that their *"sole purpose"* was evidentiary in nature (*see* 557 US at 310-311). The Court recognized that the Confrontation Clause may create additional burdens on the prosecution at criminal trials, but like other constitutional rights, the right to confrontation "is binding, and we may not disregard it at our convenience" (557 US at 325). As it was already the norm in New York for the chemist who performed the analyses on the controlled substances to be the trial witness in drug crime prosecutions, the potential additional burden was not a concern in this state.

In *Bullcoming*, the Court, noting that *Crawford* in 2004 was a pathmarking decision, found an unsworn laboratory report certifying that the defendant's blood alcohol level was above the legal threshold for aggravated DWI to be testimonial. At trial, the prosecution did not call the analyst who performed the gas chromatograph test, which produced a printout of the test results of the defendant's blood alcohol content. Instead, the prosecution introduced into evidence the laboratory report as a business record and used a different trained analyst, one who was familiar with the testing procedures and was an administrator of the statewide blood and alcohol programs, to testify as to the machine-generated results. The expert witness, similar to Huyck, was required as part of his job responsibility to provide courtroom testimony and had reviewed the reported test results, but had not supervised, conducted or observed the testing that produced the results upon which he relied for his opinion. The same scenario that occurred in *Bullcoming* occurred in this case, to wit, a witness who never tested the forensic evidence that incriminated an accused defendant was asserting that the nontestifying analyst's testing results were truthful.

The Court rejected the argument that the "surrogate testimony" provided by the expert at trial was adequate to satisfy the defendant's right to confrontation (*see* 564 US at 652). The Court rejected the proposition that the nontestifying analyst had merely certified a machine-generated number, observing that an analyst, in order to work the instrument, had to have specialized knowledge and training. It further observed that "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar" (564 US at 661). Reiterating that the Confrontation Clause requires that even reliable evidence be subject to cross-examination, the Court concluded

that "analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa' " (564 US at 661, quoting *Melendez-Diaz*, 557 US at 319-320 n 6). The Court observed that a surrogate expert would be unable to testify to what the testing analyst knew or observed about the testing process, or to the analyst's proficiency or veracity (*see* 564 US at 661-662). "[T]he Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination" (564 US at 662).

In finding that the laboratory report was testimonial on the basis that it was prepared by the testing analysts for the purpose of establishing some fact in a criminal proceeding, the Court emphasized that the defendant's blood was provided by police to the state's Department of Health laboratory, which was required by law to assist in police investigations. Further, the testing analyst had prepared a certificate concerning the blood alcohol content results in a signed but unsworn document, which was deemed sufficiently formalized (*see* 564 US at 664-665).

Recently, in *Williams v Illinois* (567 US —, 132 S Ct 2221 [2012]), a four-Justice plurality of the Supreme Court determined that there was no Confrontation Clause violation when a forensic expert in a bench trial was permitted to testify to an opinion that two DNA profiles matched based on facts about which the expert was not competent to testify. The DNA profiles, however, were not admitted into evidence. Specifically, the issue was whether it was proper for a DNA expert who had neither performed the actual testing nor was vouching for the accuracy of the profiles to testify that a DNA profile was generated by an outside lab from semen found on the victim's vaginal swabs, and that the DNA profile matched the DNA profile generated by the police lab using the defendant's blood.

The plurality took two paths to its conclusion that the expert's opinion of a DNA match between two profiles did not violate the Confrontation Clause. First, it concluded that the fact that the source of the DNA profile was found on the semen from the victim's vaginal swabs was not a fact admitted into evidence, as the lab report setting forth this information had not been admitted, and the expert's reference to that fact was not offered for the truth of the matter asserted therein. Pivot-

ally, the Court opined that since this was a bench trial, the trier of fact, which was a judge and not a layperson, would understand this evidentiary distinction (*see* 567 US at —, 132 S Ct at 2234-2235), i.e., that the factual statements had been "related by the expert solely for the purpose of explaining the assumptions on which [his or her] opinion rest[ed]" (567 US at —, 132 S Ct at 2228). Since the expert's opinion evidence of a DNA match in *Williams* had no relevancy without proof that the defendant's DNA profile was derived from the vaginal swabs from the rape victim and that the DNA profile was accurate, and neither foundational fact was admitted into evidence, this opinion testimony was inadmissible under New York law (*see People v Goldstein*, 6 NY3d 119, 127-129 [2005]). Importantly, the plurality also found that their conclusion was entirely consistent with *Melendez-Diaz* and *Bullcoming*, because in those cases, unlike *Williams*, the forensic reports of the nontestifying analysts were introduced into evidence for the truth of the matter asserted.

On its second path, the plurality used a primary purpose test narrower than the one stated in *Bullcoming*. It observed that, even if the expert's hearsay testimony as to the source of the DNA had been offered for the truth of the matter asserted, it was not a testimonial statement that the Confrontation Clause was originally understood to encompass (*see* 567 US at —, 132 S Ct at 2228)—the reason being that the laboratory report as to the source of the DNA from the vaginal swabs "was not prepared for the primary purpose of accusing a targeted individual" (567 US at —, 132 S Ct at 2243). Its primary purpose was therefore not to create evidence for use at a criminal trial of a suspect who had already been captured, but "to catch a dangerous rapist who was still at large" (567 US at —, 132 S Ct at 2243). The forensic reports in *Melendez-Diaz* and *Bullcoming* ran afoul of the Confrontation Clause because they were made for the purpose of proving the guilt of a particular defendant at trial. Thus, under the circumstances in *Williams* where there is no particular defendant, "there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile" (567 US at —, 132 S Ct at 2244).

Justice Thomas concurred in the result, but nonetheless agreed with the four dissenting Justices that the DNA reports in *Williams* were offered into evidence for their truth, and that the plurality's narrow primary purpose test, requiring that

forensic testing involve a targeted individual in order to be testimonial, was not based on constitutional text. However, he found that the reports lacked the necessary "formality and solemnity" that would render them testimonial within the meaning of the Confrontation Clause (*see* 567 US at —, 132 S Ct at 2255). None of the other eight Justices agreed with the latter rigid interpretation of testimonial hearsay.

The remaining four Justices dissented, finding the case controlled by *Bullcoming*. The dissent would have found that the DNA reports were admitted into evidence for their truth, that the reports were testimonial and that the narrow primary purpose test used by the plurality was not grounded in the constitutional text. In short, an analyst who performed the DNA tests was required to testify (*see* 567 US at —, —, 132 S Ct at 2268, 2273). The dissent further observed that the *Williams* decision has left significant confusion in its wake.

## III

For our part, we have deemed the primary purpose test essential to determining whether particular evidence is testimonial hearsay requiring the declarant to be a live witness at trial. "[A] statement will be treated as testimonial only if it was 'procured with a primary purpose of creating an out-of-court substitute for trial testimony' " (*People v Pealer*, 20 NY3d 447, 453 [2013], quoting *Michigan v Bryant*, 562 US 344, 358 [2011]). Adhering to the decisions of the Supreme Court, we did not declare any ironclad rule as to a definition of testimonial evidence. We have considered two factors of particular importance in deciding whether a statement is testimonial— " 'first, whether the statement was prepared in a manner resembling ex parte examination and second, whether the statement accuses defendant of criminal wrongdoing.' Furthermore, the 'purpose of making or generating the statement, and the declarant's motive for doing so,' also 'inform these two interrelated touchstones' " (*Pealer*, 20 NY3d at 453 [citation omitted], quoting *People v Rawlins*, 10 NY3d 136, 156 [2008], *cert denied sub nom. Meekins v New York*, 557 US 934 [2009]).

 Here, there was a criminal action pending against defendant, and the gun, found in the basement of a multifamily dwelling where defendant lived, was evidence seized by police for that prosecution. Swabs from the gun were then tested by an accredited public DNA crime laboratory with the primary (truly, the sole) purpose of proving a particular fact in a

criminal proceeding—that defendant possessed the gun and committed the crime for which he was charged. The testing analysts purposefully recorded the DNA profile test results, thereby providing the very basis for the scientific conclusions rendered thereon. Under these circumstances, the laboratory reports as to the DNA profile generated from the evidence submitted to the laboratory by the police in a pending criminal case were testimonial. The DNA profiles were generated in aid of a police investigation of a particular defendant charged by an accusatory instrument and created for the purpose of substantively proving the guilt of a defendant in his pending criminal action. The primary purpose of the laboratory examination on the gun swabs could not have been lost on the OCME analysts, as the laboratory reports contain the police request for examination of the gun swabs on the basis that the "perp" handled the gun and repeatedly identify the samples as "gun swabs." In addition, certain documents in the OCME file refer to the suspect (defendant) by name.

The facts of this case fit into even the narrow primary purpose test articulated by the *Williams* plurality.[4] On this record, the admission into evidence of the laboratory reports for their truth as to the generation of the DNA profile from the gun without a testifying analyst who performed, witnessed or supervised any portion of the testing is indistinguishable from *Bullcoming*.[5] The fact that defendant's DNA profile was found on the gun was established by testimonial hearsay in the

---

4. Contrary to the position taken by the dissent, this case is not analogous to *Williams*, or *Brown* for that matter, unless one eschews the pivotal fact that defendant was not only an identified suspect, but was charged with the possession of the very gun that the lab was subsequently asked to test. And, unlike *Williams*, the reports of the DNA profiles were admitted into evidence for their truth. Further, the plurality in *Williams* formulated a narrow primary purpose test for testimonial hearsay that would include this case, and conspicuously did not categorically exempt DNA laboratory reports from the Confrontation Clause. Although Justice Breyer, in his concurring opinion, discussed the possible solution of a presumptive exception for DNA reports, it was conditioned on the ability to allow the defendant to call the analysts on his or her own behalf, a proposal that might prove as onerous as an "all analysts" rule.

5. The laboratory report in *Melendez-Diaz* was from the "State Laboratory Institute, a division of the Massachusetts Department of Public Health" (*see* 557 US at 346). The testifying witness in *Bullcoming* was from "the New Mexico Department of Health, Scientific Laboratory Division" (*see* 564 US at 652-653). The dissent relies heavily on the fact that OCME, affiliated with the NYC Department of Health and Mental Hygiene, and given its role as a medical examiner, is a government agency independent of law enforcement

laboratory report, which could not be admitted as a business record without honoring the right of confrontation. We cannot ignore that the People did not produce the analyst who generated the DNA profile from either the gun or the exemplar in this case. As a result, these critical analysts who engaged in an independent and qualitative analysis of the data during the DNA typing tests—none of whom was claimed to be unavailable—were effectively insulated from cross-examination. And Huyck, instead, was permitted to parrot the recorded findings that were derived from the critical witnesses' subjective analyses. To be sure, Huyck merely exported the very DNA profiles that the testing analysts had generated to create a box score chart. Although Huyck testified that she had subsequently reviewed the reports of the DNA profile generated by the non-testifying analysts and agreed with the results they obtained in the actual performance of the testing, this is nothing more than surrogate testimony to prove a required fact—that defendant's DNA was found on the loaded gun for which he stood charged.

## IV

By finding the report of blood alcohol content results from a gas chromatograph to be testimonial, *Bullcoming* demands that where the primary purpose test has been satisfied, forensic reports offered into evidence for their truth, as here, must be assessed for their admissibility as those reports are not covered by any categorical exception to testimonial hearsay. In this regard, although we have previously held that certain DNA laboratory reports were raw data or machine-generated (*see People v Meekins*, 10 NY3d 136, 158-159 [2008]; *People v Brown*, 13 NY3d 332, 340 [2009]), Huyck's testimony and the labora-

---

for purposes of the People's discovery obligation under CPL article 240. This relationship was a factor in the primary purpose test considered in *Pealer* (20 NY3d at 454-455). However, since the predominant purpose of OCME's Forensic Biology Department is to provide DNA testing on crime scene evidence for the New York City Police and prosecutors, the independent nature of the agency does not exclude it from the primary purpose test. To be sure, if the label of "independent agency" was controlling, *Bullcoming* would have been decided differently and we would have exempted OCME from our Confrontation Clause analysis long ago. Any emphasis on this factor in this particular case is unpersuasive as the evidence was submitted to the lab for testing during a pending criminal action. The preparation of these DNA profiles was not ancillary to the future prosecution of an unknown defendant (*see* 20 NY3d at 455).

tory reports admitted into evidence prove otherwise in this case. Further, the original DNA profiles in *Brown* and *Meekins* would not be considered testimonial hearsay as they do not satisfy the *Williams* primary purpose test. The profiles, like those in *Williams*, were generated from rape kits by private laboratories when the suspect was unknown and the defendant was later identified on a "cold hit" from the CODIS database. Nonetheless, our focus in both of those cases was that extrajudicial facts were shepherded into evidence by a testifying expert whose subsequent independent analysis of that raw data provided the assurance that the DNA profile generated was accurate. Our sharpest focus was on the final stage of the DNA typing results, to wit, the generated DNA profile.

In *Brown*, when we characterized the DNA evidence as "machine-generated graphs," we referred to the electropherogram. The testifying witness, an OCME Level IV Criminalist who had supervised the generation of the DNA profile from the defendant's exemplar, had personally examined and independently interpreted the data (*see* 13 NY3d at 340; *People v Brown*, 9 Misc 3d 420 [Sup Ct, Queens County 2005]). Determinatively, the expert testified that any conclusions or opinions she reached from the raw data supplied by the outside laboratory were her own and were not contained in any reports (*see* 13 NY3d at 337). By contrast, Huyck, who made no such claim and who was not an OCME supervisor, reviewed the reports of the other OCME analysts, including the numerical DNA profiles generated after an editing process, saw that the "necessary people" had signed off and agreed with their conclusions. This cursory testimony vitiated defendant's right to confront the analysts who actually generated the DNA profiles. Contrary to the dissent's position, we conclude that Huyck's exportation of the two identical numerical sequences into a chart so that the jury could easily see the numbers were identical is not the same as independently verifying the accuracy of testing conducted by the nontestifying analysts who produced those two DNA profiles. To this end, Huyck was acting purely as a surrogate witness as defined by *Bullcoming* in vouching for the accuracy of the DNA profiles. Her conclusory testimony in this regard was based solely on the reports of the nontestifying analysts that were admitted into evidence for their truth and

not based on a separate, independent and unbiased analysis of the raw data.[6]

We interpret our prior decisions in *Brown* and *Meekins* informed by the binding precedent of the Supreme Court in this Sixth Amendment context. The record in this particular case perforce informs the present decision as to the nature of the testimonial evidence of the DNA profiles. In contrast, the dissent, by apparently discounting the continued viability of the *Bullcoming* and *Melendez-Diaz* decisions, notwithstanding that the *Williams* plurality did not overrule its own precedent, unduly relies on core factors that informed the dissents in those cases in defining testimonial evidence when dealing with forensic reports. The multiple factors set forth in those dissents—especially laboratory workload, the professional detachment of laboratory analysts and the analysts' objective recording of facts pursuant to scientific protocols—are once again touted in the dissent in this case.

We will not indulge in the science fiction that DNA evidence is merely machine-generated, a concept that reduces DNA testing to an automated exercise requiring no skill set or application of expertise or judgment. Likewise, the sophisticated software programs require trained analysts who engage in skilled interpretation of the data from the electrophoresis instrument, using the computer software with its color images, particularly as to the peaks in the graphs, to construct the DNA profile. Even Huyck conceded that the testing and reviewing analysts independently make these necessary and qualitative judgments by applying the laboratory's thresholds when using the software.[7] And, of course, the editing tables in the admitted DNA reports that were compiled during electrophore-

---

**6.** To the extent the dissent supposes that DNA typing does not involve the independent analysis of a trained expert, we note that Justice Breyer's concurrence in *Williams*, relied upon by the dissent, cites the following description which proves otherwise:

"Using the proper computer software, we properly transcribed the data produced by the electropherogram into a report. We applied the proper criteria to review the computer determinations of what the allele values are at each of the chromosomal locations analyzed. We properly documented those allele values to produce the DNA profile" (567 US at —, 132 S Ct at 2254 [Appendix] [internal quotation marks omitted]).

**7.** The present case involved a single source 16 loci DNA profile. This record does not provide a basis to review issues which may arise in the more complex interpretation of DNA profiles from mixtures or in high sensitivity DNA analysis. We note that the amicus curiae brief by the Innocence Network

sis as to the testing of both the gun swabs and defendant's exemplar in this case bear witness to this fact.

As Huyck testified, every person who prepared the information in the laboratory reports had a business duty to do so truthfully and accurately. It is incongruous to our state's mission to foster scientific excellence in our public DNA crime laboratories to suggest that the recording of the test results in the reports of accredited labs is not an entry of scientific certainty because of the absence of a hypertechnical requirement of formalism. Under these circumstances, even though the DNA profiles were not provided under oath, they were obviously facts prepared to be used as critical evidence at a criminal trial and are sufficiently formal to be considered testimonial (*see e.g. Goldstein*, 6 NY3d at 129). Moreover, an excessive emphasis on formalism for the admissibility of business records is particularly unwise in the area of scientific reports, as the certification requirement can be easily subverted by a simple omission in the format of the documents, with a design to facilitate their use as evidence in a criminal trial.

## V

The People raise the same concern previously presented to the United States Supreme Court in its *Crawford* cases dealing with the admission into evidence of forensic science laboratory reports—given OCME's team and rotation procedures, practical difficulties will be presented if they are required to produce each analyst who was involved in the DNA testing. The Court has not accepted these concerns as a basis for categorically exempting forensic evidence as testimonial hearsay and dispensing with a defendant's constitutional right to confrontation (*see Bullcoming*, 564 US at 665; *Melendez-Diaz*, 557 US at 325-328). We hold, however, that an "all analysts" rule is not consistent with the decisional law. Clearly, not every person who comes in contact with the evidence—for instance, analysts who are performing duplicative work, such as reviewers, those involved in the testing of controls, or certain individuals who would only be relevant to issues as to the chain

---

provides examples of wrongful convictions attributed to the misinterpretation of DNA profiles by analysts derived from mixture samples (*see* Innocence Network brief at 26-29). The complexity in the calling of alleles by the analyst in mixture and high sensitivity DNA samples while using the DNA typing computer software undermines any position favoring the use of experts who play no part in the generation of the DNA profile in the final stage of the DNA typing process.

of custody—must be produced (*see Melendez-Diaz*, 557 US at 311 n 1). Here, the record is somewhat limited on this issue as neither the People nor defendant seriously attempted to demonstrate the importance of any one analyst or any one step in the actual DNA typing process. However, where the laboratory report is testimonial in nature—and the generation of the DNA profile in this pending criminal action was testimonial—at least one analyst with the requisite personal knowledge must testify (*see Williams*, 567 US at — n 4, 132 S Ct at 2273 n 4 [Kagan, J., dissenting] [stating that "none of our cases . . . has presented the question of *how many* analysts must testify about a given report . . . The problem in the cases . . . is that *no* analyst came forward to testify" and opining that the existence of that open question "is no reason to wrongly decide the case before us—which, it bears repeating, involved the testimony of not twelve or six or three or one, but zero . . . analysts"]).

More succinctly, nothing in this record supports the conclusion that the analysts involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages, are necessary witnesses. As this was a 16 loci DNA profile from a single source, any hypothetical missteps of the analysts in the multiple stages preliminary to the DNA typing at the electrophoresis stage would result in either no DNA profile or an incomplete DNA profile, or one readily inconsistent with a single source 16 loci profile.[8] As noted in the *Williams* plurality, "the knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard" (567 US at —, 132 S Ct at 2244). Accordingly, we conclude that it is the generated numerical identifiers and the calling of the alleles at the final stage of the DNA typing that effectively accuses defendant of his role in the crime charged. In addition, OCME or a laboratory that uses a similar multiple-analyst model may adapt its operation so that a single analyst is qualified to testify as to the DNA profile testing. For example, an analyst who generated the DNA profile from one sample may also observe the final stage of testing or retesting involved in the generation of the other profile. Nor do we suggest that, when the testing analysts are unavailable, a fully qualified OCME expert, like the witness in *Brown*, cannot testify after

---

8. As a practical matter, in this case, "shoddy or dishonest work" (*see Williams*, 567 US at —, 132 S Ct at 2239) would appear unlikely to result in an exact match to defendant's own DNA profile.

analyzing the necessary data, including an independent analysis of the computer imaging from the software used for calling the alleles and recording their separate and distinct analysis. Thus, the claim of a need for a horde of analysts is overstated and a single analyst, particularly the one who performed, witnessed or supervised the generation of the critical numerical DNA profile, would satisfy the dictates of *Crawford* and *Bullcoming*.[9]

Notably, courts around the country have grappled with the application of *Bullcoming* and *Williams* vis-à-vis DNA evidence and have sought to satisfy a defendant's right to confrontation while sensibly placing some limit on the number of analysts who are necessary to testify at trial (*see e.g. State v Roach*, 219 NJ 58, 79, 95 A3d 683, 695-696 [2014] [observing that an independent reviewer trained in the testing procedures and knowledgeable about the laboratory's processes can testify based on his or her independent review of the raw DNA data and the conclusions drawn from that data; "(h)owever, the testimony must be provided by a truly independent and qualified reviewer of the underlying data and report, and the witness may not merely parrot the findings of another"]; *Speers v State*, 999 NE2d 850, 855 [Ind 2013] [testimony of technician who prepared sample for later testing was considered chain of custody and was not required where sole analyst who conducted DNA testing and prepared lab reports testified]; *State v Lui*, 179 Wash 2d 457, 489, 315 P3d 493, 508 [2014] ["the only 'witness against' the defendant in the course of the DNA testing process is the final analyst who examines the machine-generated data, creates a DNA profile, and makes a determination that the defendant's profile matches some other profile"]; *State v Lopez*, 45 A3d 1, 14, 16 [RI 2012] [analyst who evaluated the raw data and prepared DNA profile was "the very witness . . . deemed necessary in *Bullcoming*" and the fact that he had used the data generated by other analysts to form his independent conclusion "did not bestow upon defendant the constitutional right to confront each and every one of those subordinate analysts"]; *State v Medicine Eagle*, 835 NW2d 886, 898-899, 2013 SD 60, ¶ 34 [SD 2013] [no confrontation violation where each analyst who performed steps of the testing did

---

9. There is also the option that, when a prosecution approaches trial, a single analyst, who was not involved in the original tests, may participate in the generation of DNA profiles during a retest of the samples, if same are available.

not testify, as testifying analyst participated in various steps in the DNA testing, "independently reviewed, analyzed, and compared the data," and came to independent conclusions]; *State v Gomez*, 226 Ariz 165, 169-170, 244 P3d 1163, 1167-1168 [2010] [not every analyst that "handled the samples and obtained the machine-generated data" had to testify, where the testifying analyst was not a mere "conduit," but had reached independent conclusions on the DNA profiles]; *see also Commonwealth v Greineder*, 464 Mass 580, 984 NE2d 804 [2013]; *State v Norton*, 443 Md 517, 117 A3d 1055 [2015]; *Young v United States*, 63 A3d 1033 [DC 2013]).[10] We conclude that an analyst who witnessed, performed or supervised the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, must be available to testify.

Finally, the dissent's concern about the admissibility of redacted autopsy reports, specifically ones omitting the opinions as to the cause and manner of death, is misplaced. We are not retreating from our prior decisions holding that, given the primary purpose of a medical examiner in conducting autopsies, such redacted reports—"a contemporaneous, objective account of observable facts that [do] not link the commission of the crime to a particular person"—are not testimonial (*Pealer*, 20 NY3d at 454; *People v Freycinet*, 11 NY3d 38, 42 [2008]; *see also United States v James*, 712 F3d 79, 99 [2d Cir 2013]).

Accordingly, the order of the Appellate Division should be reversed, and a new trial ordered.

GARCIA, J. (dissenting). We confront the abyss created by the prospect of applying the Supreme Court's line of Sixth Amendment cases in *Crawford v Washington* (541 US 36 [2004] [out-of-court statement to police by the defendant's spouse]); *Melendez-Diaz v Massachusetts* (557 US 305 [2009] [affidavits that substance seized from the defendant was in fact cocaine]); and *Bullcoming v New Mexico* (564 US 647 [2011] [laboratory report certifying that the defendant's blood-alcohol concentra-

---

**10.** The dissent would hold that, if the DNA profiles are testimonial, every analyst involved in generating the profiles must be produced for cross-examination (*see* dissenting op at 336). This sweeping conclusion is reached without citation and, as noted above, is inconsistent with the weight of authority, including the *Williams* plurality opinion.

tion was above the threshold for DWI]) so as to require the numerous analysts who typically handle the processing of DNA samples to appear in court. The Supreme Court declined to leap (*see Williams v Illinois*, 567 US —, 132 S Ct 2221 [2012]): the majority does. Because this result is not required by Supreme Court precedent, runs contrary to our own case law, and will cause unnecessary harm to the administration of the criminal justice system, I dissent.

## I.

The facts in the record of this case are essentially the same as those in *People v Brown* (13 NY3d 332, 335 [2009]) in which we rejected a similar Sixth Amendment challenge. The minor differences, discussed below, should not compel a different result here.

New York City's Office of Chief Medical Examiner (OCME) is not a law enforcement agency; it is part of New York City's Department of Health and Mental Hygiene (*see id.* at 340; *People v Washington*, 86 NY2d 189, 192 [1995]). OCME develops DNA profiles for comparison purposes, namely to run against or compare to a known exemplar or a database of DNA profiles. To do so, OCME employs a five-step process—including four tests—each of which is performed by one or more analysts. First, an analyst unpackages and documents the evidence, examines the sample, and takes cuttings to prepare the sample for testing. The second step is extraction, in which an analyst adds chemicals to the sample, heats and cools it, and sometimes filters it to release the DNA from the cells. Third, an analyst measures the amount of DNA contained within the sample in a process called quantitation. In the fourth step, called amplification, an analyst makes millions of copies of 16 specific "loci" that OCME examines to develop a DNA profile. The fifth step is electrophoresis in which an analyst runs the sample on a DNA instrument, resulting in an electropherogram which is also known as a DNA profile. As explained by a witness in this case, "[a] DNA profile is the end result of DNA testing . . . and it is represented by a string of numbers."

In order to ensure accuracy and reliability in its results, OCME runs all of those tests twice. Different analysts run the duplicate tests. Other internal controls, such as an additional observer, ensure that analysts are testing the correct sample and following appropriate procedures. Accordingly, many

analysts—usually 10 or more—are routinely involved in developing a DNA profile from a single sample. Each analyst is "trained the same way and . . . in the same techniques."

Volume is an issue. OCME has approximately 150 analysts working in its laboratory on more than 8,000 cases per year, some cases with multiple items to test, and accordingly "it would be impossible for" a single analyst to perform the entire process on every sample. In the past, budget constraints and the sheer volume of samples made it necessary for OCME to subcontract out certain work to independent laboratories (*see Brown*, 13 NY3d at 336). To address these issues in-house, OCME uses a "rotation system," under which the analysts perform an assigned task—for example, examining packaging or performing one of the four tests—for a specified period of time. The analysts then rotate to a different step in the process.

A separate Quality Assurance Department maintains the instruments in OCME's laboratory. Employees of that Department also ensure that "the chemicals and the instruments used" in the laboratory "are functioning as they should."

OCME followed this procedure in compiling the DNA profiles at issue here. On January 17, 2010, after defendant was arrested, a police officer with the evidence collection team swabbed a gun recovered in the basement of the building in which defendant lived in order to test for DNA. The officer packaged, sealed, and vouchered three separate samples and sent them to OCME for DNA analysis. That officer testified at trial.

On January 20, 2010, OCME received the three separately-packaged swabs taken from the gun. Melissa Huyck, an OCME Criminalist assigned to the Department of Forensic Biology, "opened up the envelopes that the three swabs were in and . . . cut a portion of each swab and put it into a tube."

After Huyck unpacked the swabs, the samples underwent the remaining four steps in OCME's typical process to develop a DNA profile. Huyck did not perform or observe any of the four tests, which were done by at least six other analysts. The resulting DNA profile—the particular "string of numbers"—belonged to an unknown male, "Male Donor A," and would be expected to be found in approximately one in greater than one trillion people. Huyck's Laboratory Report (she signed as "Analyst") setting forth these results is dated February 16, 2010. In it she notes that the results in this case do not match

any previous cases contained in the OCME local DNA data bank. At approximately this same time, a "DNA PROFILE EVALUATION FORM" was created and Huyck signed this document as both preparer and "Interpreting Analyst." Huyck interpreted the DNA profile and acknowledged that it was "eligible for LINKAGE and/or the appropriate specimen category."

On September 2, 2010, after the determination that there was no match in the database, the same officer obtained a DNA sample from defendant by swabbing the inside of his cheek; this is known as a buccal swab. This occurred more than seven months after the swabbing of the gun and more than six months after the DNA profile from the gun was completed. The officer vouchered the swab and sent it to OCME for DNA analysis. As noted above, this officer testified at trial.

OCME received defendant's exemplar on September 4, 2010. Approximately 10 analysts processed and tested defendant's exemplar in the same manner described above. As with the testing of the gun swabs, Huyck did not perform or observe any of the tests conducted on defendant's exemplar.

Critically, Huyck did compare the results of the DNA profiles developed from the gun and from defendant's exemplar. As with the gun swab profile comparison, a "DNA PROFILE EVALUATION FORM" was prepared and again Huyck signed the form as the "Interpreting Analyst." This form notes the match between defendant's exemplar and the DNA profile from the gun swabs. Huyck's comparison was not cursory; she did "not just sign[ ] the report." Instead, she conducted an independent assessment by "looking at all of the data and making sure that [she] agree[d]" with the analysis and conclusions. She "look[ed] at the actual data" and "reviewed the results for both cases once the results were compiled." She emphasized that she "reviewed and looked at the data for both cases." She also reviewed the results of the tests to confirm the analysts' editing decisions and that the analysts followed the required internal controls.[1]

---

1. A DNA analysis sometimes contains information, described as peaks and not actually part of the sample, that is essentially a by-product of the sensitive DNA testing process. This information is edited out of the DNA analysis automatically by the testing software or by an analyst after the program is complete. If an analyst removes the information, a second analyst reviews the decision to confirm that the action was appropriate.

Huyck, who, as described above, had taken certain steps earlier in the OCME process, testified at trial. It was her expert opinion that the two profiles "are the same male DNA profile." In other words, Huyck testified that "to a reasonable degree of scientific certainty," defendant's DNA "was found on the swabs of the gun." At trial, Huyck explained to the jury how the numerical information contained in the "Casefile Table" demonstrated that the DNA on the gun matched the DNA from defendant's exemplar. OCME's files, containing, among other things, the DNA profile developed from the gun swabs and the two DNA Profile Evaluation Forms signed by Huyck as the Interpreting Analyst, were admitted into evidence as business records. Notably, defense counsel also met with Huyck before trial "at the OCME [l]ab" to go "over the results in the case."

## II.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [or her]." In *Crawford*, the Supreme Court held that "[t]estimonial statements of witnesses absent from trial" may be "admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine" (541 US at 59). Only " 'testimonial statements' . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause" (*Davis v Washington*, 547 US 813, 821 [2006]). The Confrontation Clause is not implicated by "nontestimonial hearsay" and, therefore, such evidence may be admitted at trial in compliance with a state's hearsay law (*Crawford*, 541 US at 68). In *Crawford*, the Supreme Court applied that test and concluded that the State's use at trial of statements made to police by the defendant's wife violated the Confrontation Clause (*see id.* at 68-69).

In a trilogy of cases, the Supreme Court applied *Crawford* to the admission of forensic evidence. In *Melendez-Diaz*, the defendant was charged with distributing and trafficking in cocaine (*see* 557 US at 308). At trial, the prosecution "submitted three 'certificates of analysis' showing the results of the forensic analysis performed on the seized substances" by a state laboratory (*id.*). The certificates or affidavits stated that the seized evidence was cocaine (*see id.*) and were admitted under Massachusetts law as "prima facie evidence of the composition, quality, and the net weight of the narcotic . . .

analyzed" (*id.* at 309 [internal quotation marks omitted], quoting Mass Gen Laws, ch 111, § 13). The Supreme Court held that "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment" (*id.* at 311). The Court continued: "To the extent the analysts were witnesses . . . , they certainly provided testimony *against* [the defendant], proving one fact necessary for his conviction—that the substance he possessed was cocaine" (*id.* at 313).

Two years later, the Supreme Court decided *Bullcoming*. There, the "[p]rincipal evidence against [the defendant] was a forensic laboratory report certifying that [his] blood-alcohol concentration [(BAC)] was well above the threshold for aggravated [driving while intoxicated]" (564 US at 651). "At trial, the prosecution did not call as a witness the analyst who signed the certification. Instead, the State called another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the defendant's] blood sample" (*id.*). Further, the testifying analyst never "reviewed [the nontestifying analyst's] analysis" (*id.* at 655).

The Court held that "surrogate testimony . . . does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist" (*id.* at 652).

> "Critically, the report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author—namely, that the defendant had a blood-alcohol level of 0.21. This was the central fact in question at the defendant's trial, and it was dispositive of his guilt" (*Williams*, 567 US at —, 132 S Ct at 2233).

In dissent, Justice Kennedy expressed alarm that "[t]he persistent ambiguities in the Court's approach are symptomatic of a rule not amenable to sensible applications" (*Bullcoming*, 564 US at 679 [Kennedy, J., dissenting]).

*Williams*, the third case, and the one most analogous to this one, resulted in a fractured decision in which five Justices concluded that the defendant's Sixth Amendment rights had not been violated. In the defendant's bench trial for rape, "the prosecution called an expert who testified that a DNA profile

produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of [the defendant's] blood" (567 US at —, 132 S Ct at 2227). The process for developing the DNA profile was identical to that employed in the present case (*see id.* at Appendix to Breyer, J., concurring). The Cellmark report was not admitted into evidence or shown to the factfinder and the expert did not quote or read from the report. On cross-examination, the expert from the state lab confirmed that she did not conduct or observe any of the tests, but that she instead relied on the profile produced by Cellmark.

The plurality concluded that "this form of expert testimony [did] not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted" (567 US at —, 132 S Ct at 2228). "As a second, independent basis" for its decision, the plurality determined "that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation" (567 US at —, 132 S Ct at 2228). The plurality explained that "[t]he report was sought not for the purpose of obtaining evidence to be used against [the defendant], who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose" (567 US at —, 132 S Ct at 2228). "And the profile that Cellmark provided was not inherently inculpatory" (567 US at —, 132 S Ct at 2228).

The plurality found it "significant that in many labs, numerous technicians work on each DNA profile" (567 US at —, 132 S Ct at 2244, citing brief for New York County District Attorney's Office et al. as amici curiae at 6). "When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures" (567 US at —, 132 S Ct at 2244). In short, the plurality stated, "the use at trial of a DNA report prepared by a modern, accredited laboratory bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate" (567 US at —, 132 S Ct at 2244 [internal quotation marks and citation omitted]).

Justice Thomas concurred in the judgment "because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause" (567 US at —, 132 S Ct at 2255 [Thomas, J.,

concurring] [citation omitted]). Justice Kagan dissented, concluding, as the majority does here, that *Bullcoming* was controlling (*see* 567 US at —, 132 S Ct at 2267 [Kagan, J., dissenting] ["Have we not already decided this case?"]).

*Williams*, which as a practical matter did little more than affirm the defendant's conviction, resulted in a plurality opinion, two concurrences, and a dissent. Not surprisingly, this Court, post-*Williams*, has adhered to its well-established primary purpose test for determining whether the challenged evidence is "testimonial."

We addressed the admissibility of DNA reports squarely in *Brown*, which was decided after *Melendez-Diaz* but before *Bullcoming*. There, a hospital prepared a rape kit and sent it to OCME, and OCME sent it on to Bode Technology, a fully-accredited private laboratory, for testing. "Bode isolated a male DNA specimen from the rape kit, *reflecting a string of numbers of all 13 areas of DNA*. Bode further produced a DNA report containing machine-generated raw data, graphs and charts of the male specimen's DNA characteristics" (*Brown*, 13 NY3d at 336 [emphasis added]). The DNA characteristics were entered into a DNA database, which resulted in a " 'cold hit,' linking [the] defendant's DNA to the profile found in the victim's rape kit" (*id.*). A police officer "took a DNA sample from [the] defendant and delivered it to OCME" (*id.*). "Thereafter, a forensic biologist/criminalist from OCME compared [the] defendant's DNA characteristics to the specimen from the victim's rape kit. Based upon this analysis, she determined that the profiles were a match occurring in one out of one trillion males" (*id.*).

At trial, the People called a forensic biologist/criminalist who testified that "she supervised other criminalists at OCME, reviewed their reports and findings, and oversaw quality control management to ensure the laboratory's procedures met appropriate standards" (*id.* at 337). "The witness then testified in depth as to the characteristics of DNA and about the testing protocols for all accredited crime laboratories in the United States, including OCME and Bode" (*id.*). The defendant objected to the People's motion to "introduce the DNA report, containing a profile of the specimen taken from the victim's rape kit, as a business record" (*id.*). "The Bode documents . . . contain[ed] graphs, charts, a description of the process used to test the DNA and a statement identifying whether the profile

was of a male, female or was inconclusive" (*id.* at 338 n 2).[2] The defendant claimed that "any documents generated by Bode were 'testimonial evidence' that would violate [his] Sixth Amendment right to confrontation, unless the analyst who performed the test was present to testify" (*id.* at 337). "The People responded that the report contained merely raw data and was not testimonial, and that the witness herself had performed the analysis *in comparing [the] defendant's profile with the profile of the DNA found in the rape kit*" (*id.* [emphasis added]). The report was admitted into evidence.

On appeal, we framed the issue as "whether [the] defendant's Sixth Amendment right to confrontation was violated by the introduction of a DNA report processed by a subcontractor laboratory to [OCME] through the testimony of a forensic biologist from OCME" (*id.* at 335). Noting that our conclusion was "consistent with *Melendez-Diaz*," we held that the report was nontestimonial and, thus, "its admission did not constitute a *Crawford* violation" (*id.* at 335, 341).

In reaching this conclusion, we applied a four-part primary purpose test: (1) whether the agency that produced the record is independent of law enforcement; (2) whether it reflects objective facts at the time of their recording; (3) whether the report has been biased in favor of law enforcement; and (4) whether the report accused the defendant by directly linking him or her to the crime (*see id.* at 339-340, citing *People v Freycinet*, 11 NY3d 38, 41 [2008]; *see also People v Pealer*, 20 NY3d 447, 454 [2013], *cert denied* 571 US —, 134 S Ct 105 [2013]). We concluded that

> "unlike *Melendez-Diaz*, the People called the forensic biologist who conducted the actual analysis at issue, linking [the] defendant's DNA to the profile found in the victim's rape kit. She testified that she had personally examined the Bode file; she interpreted the profile of the data represented in the machine-generated graphs; and she made the critical determination linking [the] defendant to this crime" (*Brown*, 13 NY3d at 340).

We determined that the Bode report "was not 'testimonial' under such circumstances because it consisted of merely

---

**2.** The laboratory file admitted into evidence in *Brown* contained 72 pages, of which 29 pages related to the process performed at Bode (*see Brown*, 13 NY3d at 338 n 2).

machine-generated graphs, charts and numerical data" (*id.*). "There were no conclusions, interpretations or comparisons apparent in the report *since the technicians' use of the typing machine* would not have entailed any such subjective analysis" (*id.* [emphasis added]). Therefore, we noted, "[t]hese technicians would not have been able to offer any testimony other than how they performed certain procedures" (*id.*).

Our decision in *Brown* built on our decisions in *People v Rawlins* (10 NY3d 136 [2008], *cert denied sub nom. Meekins v New York*, 557 US 934 [2009]) and *Freycinet*, both decided prior to *Melendez-Diaz*. In *People v Meekins*, a case decided and reported with *Rawlins*, the issue was "whether DNA . . . comparison reports prepared by nontestifying experts are 'testimonial' statements within the meaning of *Crawford*" (10 NY3d at 141). "At trial, the People introduced a report prepared by an independent private laboratory containing results of DNA testing conducted on samples taken from [the] complainant's rape kit" (*id.* at 144). "The report was introduced through the testimony of two experts in DNA analysis and forensic biology . . . , neither of whom personally performed the actual testing" (*id.*). The expert from the private laboratory "testified that she supervised the technicians who performed the testing in this case and performed a final review of their results" and "that her duties involved ensuring that technicians followed established protocols" (*id.*). The private lab developed a DNA profile, but did not compare the results, instead sending the report to OCME for that purpose.

The OCME expert testified that OCME technicians reviewed the file, edited the data by weaning out peaks that might not be DNA, and uploaded the profile into a database of existing profiles. After uploading the profile, the Division of Criminal Justice Services notified OCME that the profile matched the defendant's DNA. OCME then "made sure that the two DNA profiles were the same" (*id.* at 145). At trial, the OCME expert "gave her opinion that the DNA profiles from the rape kit were the same as [the] defendant's" (*id.*). The trial court admitted "a consolidated file containing both labs' reports as [OCME's] business records" (*id.* at 146).

We concluded that the DNA data generated by the private laboratory was not testimonial because "the report in question contained raw data . . . in the form of nonidentifying graphical information" (*id.* at 158-159). Such "graphical DNA test results, standing alone, shed no light on the guilt of the ac-

cused in the absence of an expert's opinion that the results genetically match a known sample" (*id.* at 159). Similarly, the reports of the OCME technicians were not testimonial because they did "not directly link [the] defendant to the crime. It was left to the testifying witness . . . to draw the inference from the evidence that [the] defendant's DNA profile matched those obtained from the rape kit" (*id.* at 160).

By contrast, in *Rawlins*, we concluded that the latent fingerprint reports at issue were testimonial because they were "inherently accusatory and offered to prove an essential element of the crimes charged" (*id.* at 157). In effect, the missing author "was 'testifying' through his reports that, in his opinion, [the] defendant [was] the same person who committed the burglaries" and, thus, such reports—"which compare unknown latent prints from the crime with fingerprints from a known individual—fit the classic definition of a weaker substitute for live testimony at trial" (*id.* [internal quotation marks and citation omitted]). As the Court noted, "our task in each case must be to evaluate whether a statement is properly viewed as a surrogate for accusatory in-court testimony" (*id.* at 151).

In *Freycinet*, we relied on *Rawlins* and *Meekins* in finding that a redacted autopsy report was not testimonial under *Crawford* (*see Freycinet*, 11 NY3d at 39, 42). The report was "redacted to eliminate" the author's opinions rendering it "very largely a contemporaneous, objective account of observable facts" (*id.* at 42). "The giving of opinions was left to [another doctor], who testified at trial" (*id.*). Notably, we conceded that "a report of a doctor's findings at an autopsy may reflect more exercise of judgment than the report of a DNA technician" (*id.*). Still, we determined that the autopsy report "did not directly link [the] defendant to the crime" and, thus, the unavailable author of the report "was not [the] defendant's 'accuser' in any but the most attenuated sense" (*id.*).

After *Bullcoming* and *Williams* were decided, we refused to retreat from our precedent in *Rawlins, Meekins, Freycinet*, and *Brown*. Referencing those cases, we rejected the notion "that *Melendez-Diaz* pronounced a shift in Confrontation Clause analysis that might call our precedent into question" (*Pealer*, 20 NY3d at 455). In *Pealer*, we cited *Williams*, along with *Brown* and *Rawlins*, for the proposition that "a graphical DNA report that d[oes] not explicitly tie the accused to a crime" is nontestimonial because it sheds "no light on the guilt of the accused in the absence of an expert's opinion that the results

genetically match a known sample" (*Pealer*, 20 NY3d at 454 [internal quotation marks and citations omitted]).

After reaffirming our prior holdings, we applied the four-part primary purpose test articulated in *Brown* and held that "records pertaining to the routine inspection, maintenance and calibration of breathalyzer machines . . . are nontestimonial . . . [and] are not subject to the Confrontation Clause requirements set forth in *Crawford*" (*id.* at 451). We found it "significant that, as with an autopsy report or a graphical DNA report, and unlike the certification of the accused's actual [BAC] in *Bullcoming*, the breathalyzer testing certificates do not directly inculpate [the] defendant or prove an essential element of the charges against him [or her]" (*id.* at 455). The records at issue "simply reflected objective facts that were observed at the time of their recording in order to establish that the breathalyzer would produce accurate results, rather than to prove some past event" (*id.*).

The Appellate Division has similarly concluded, post-*Williams*, that presenting the expert that "conducted the critical analysis . . . by comparing the DNA profiles derived from the crime scene evidence to the defendant's DNA profile and concluding that all of the profiles matched" is sufficient to protect a defendant's Sixth Amendment right to confrontation even if that expert "lacked firsthand knowledge of the testing of each item of evidence" (*People v Washington*, 108 AD3d 576, 577 [2d Dept 2013], *lv denied* 22 NY3d 1091 [2014]; *see People v Fucito*, 108 AD3d 777, 777-778 [2d Dept 2013], *lv denied* 22 NY3d 955 [2013]; *People v Rios*, 102 AD3d 473, 475 [1st Dept 2013], *lv denied* 20 NY3d 1103 [2013]; *see also People v Jackson*, 108 AD3d 1079, 1080 [4th Dept 2013], *lv denied* 22 NY3d 997 [2013] [applying same analysis to latent fingerprint evidence]). By contrast, the Appellate Division has concluded, correctly in my opinion, that the unavailability of the person actually offering the critical analysis comparing the DNA samples violates a defendant's Sixth Amendment right to confrontation (*see People v Oliver*, 92 AD3d 900, 901-902 [2d Dept 2012], *lv denied* 19 NY3d 965 [2012]).

### III.

There are two issues before us: first, whether the DNA profiles entered into evidence were testimonial; and second, whether the witness Huyck conducted the critical analysis in comparing the DNA profiles. I disagree with the majority's

legal conclusion as to the first issue. As to the second, the majority's conclusion appears to be based upon a misreading of the record and a misunderstanding of the role required of the witness.

The majority frames the first issue as whether "the laboratory reports as to the DNA profile generated from the evidence submitted to the laboratory by the police in a pending criminal case were testimonial," thereby implicating defendant's Confrontation Clause rights (majority op at 308). Answering this question requires application of our four-part primary purpose test.

The majority focuses primarily on three of the four *Brown* factors and concludes that those "laboratory reports as to the DNA profile" were prepared for the primary purpose of creating an out-of-court substitute for trial testimony (majority op at 307-308 ["Swabs from the gun were then tested by an accredited public DNA crime laboratory with the primary (truly, the sole) purpose of proving a particular fact in a criminal proceeding—that defendant possessed the gun and committed the crime for which he was charged"]). While purporting to apply our primary purpose test, the majority in fact opts for the reasoning set forth in the *Williams* dissent: informed by that analysis, the majority reaches the same result—at least one analyst must testify (*see Williams*, 567 US at — n 4, 132 S Ct at 2273 n 4 [Kagan, J., dissenting]). Echoing that dissent, the majority concludes that the Supreme Court has already decided this case—in *Bullcoming* (*see* majority op at 304 ["The same scenario that occurred in *Bullcoming* occurred in this case"]; *see id.* at 310 ["Huyck was acting purely as a surrogate witness as defined by *Bullcoming*"]). Applying this Court's traditional four-part test to the facts here, it is clear that this case is not *Bullcoming* but *Brown*. Accordingly, the DNA profiles are not testimonial and their admission did not violate defendant's Sixth Amendment rights.

## Independent of Law Enforcement

With respect to the first factor, it is settled that OCME, the agency that produced the reports, is independent of law enforcement. This Court concluded as much in *Brown*: "OCME and [the independent lab] are not law enforcement entities; they are scientific laboratories that work independently from the District Attorney and New York City Police Department" (13 NY3d at 340). The majority relegates this factor to a footnote.

## Objective Facts

As to the second factor, the majority appears to take issue with whether the DNA report "reflects objective facts at the time of their recording" (*id.* at 339). The majority emphasizes that the DNA reports here, perhaps unlike the machine-generated graphs in *Brown*, contained "editing tables . . . compiled during [the] electrophoresis" processes of both the gun swabs and defendant's exemplar (majority op at 311-312). Such emphasis on "editing" is misplaced given our conclusion in *Meekins* that the at-issue reports were not testimonial even though OCME technicians " 'edit[ed] . . . the data'—or, interpreted the graphical data by 'wean[ing] out what peaks might not be DNA, because there are times that peaks will show up in the data that are not actually . . . DNA alleles or DNA peaks' " (10 NY3d at 145). It seems inconceivable that DNA testing has become less reliant on computer technology—and more dependent on human input—in the eight years since *Meekins* was decided, and nothing in the record suggests that to be the case.

There is no reason to conclude that the process for creating the DNA profile at issue in this case, and the materials generated as a result, was in any relevant way different than that considered by this Court in *Brown* and *Meekins*. It is identical to the process detailed in the appendix to Justice Breyer's concurrence in *Williams*. The same graphs and charts making up the DNA profiles at issue in those cases make up the OCME records here, namely objective facts in the form of a "graphical DNA report that d[oes] not explicitly tie the accused to a crime" (*Pealer*, 20 NY3d at 454).

## Law Enforcement Bias

The majority's most significant concern seems to fit under the "biased in favor of law enforcement" factor. The majority states: "the original DNA profiles in *Brown* and *Meekins* would not be considered testimonial hearsay as they do not satisfy the *Williams* primary purpose test" (majority op at 310). The majority continues: "The profiles, like those in *Williams*, were generated from rape kits by private laboratories when the suspect was unknown and the defendant was later identified on a 'cold hit' from the CODIS database" (*id.*).

The majority also believes compelling the fact that there was an identified "perp" who was noted on certain materials in the

OCME file—in some instances by name—as having handled the gun (*see id.* at 308). According to the majority, "[t]he DNA profiles were generated in aid of a police investigation of a particular defendant charged by an accusatory instrument and created for the purpose of substantively proving the guilt of a defendant in his pending criminal action," and are therefore testimonial under these circumstances (*id.*).

As noted above, OCME is not affiliated with any law enforcement agency but rather with the Department of Health. It is impossible to see how as a constitutional matter, protection of defendant's Sixth Amendment rights hinges on whether, because of budget or backlog, the testing was subcontracted to a private laboratory (*see Brown*, 13 NY3d at 336). As in the present case, in *Brown* it was the OCME expert who testified at trial as to the match. Moreover, as this Court noted in *Meekins*, "[a] salient characteristic of objective, highly scientific testing like DNA analysis is that the results are not inherently biased toward inculpating the defendant; they can also exculpate" (10 NY3d at 153). Expanding on this point, we held that "a lab technician ordinarily has no subjective interest in the test's outcome, and could hardly affect the result in any event; the analyst was simply recording, contemporaneously, the administration of scientific protocol to reveal what is hidden from the naked eye" (*id.* at 154; *see Williams*, 567 US at —, 132 S Ct at 2244 [numerous technicians worked on each DNA profile and "(w)hen the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures"]). As we have noted, our primary purpose test "on its face and in its application, properly reflects the view that not all government involvement inevitably leads to the forbidden testimonial fruit" (*Rawlins*, 10 NY3d at 148-149). There is no reason to conclude that an analyst at a government lab unaffiliated with law enforcement, operating as described above, presents any greater risk of bias for the prosecution.

The "cold hit" aspect of those prior cases, even if relevant to any constitutional analysis, is easily addressed. In *Meekins*, this Court noted that OCME's file admitted into evidence contained "the work of technicians" from that government office who had contemporaneous notice that the defendant was a suspect (*id.* at 160). Analysts working in the lab in that case "knew or had every reason to know (because they were working on a rape kit) that their findings could generate results

that could later be used at trial" (*id.* at 159). We concluded, however, that there was no constitutional violation as "their reports [did] not directly link [the] defendant to the crime" (*id.* at 160). Rather, that was done by the expert who testified at trial (*see id.*; *see also Brown*, 13 NY3d at 336, 340 [biologist/ criminalist made critical determination linking the defendant to the crime using the defendant's exemplar obtained after cold hit]).

The facts of this case certainly rebut any suggestion that the report was—or could have been—biased toward law enforcement. The DNA profile from the gun was generated prior to the time any DNA exemplar profile was created for the defendant. In fact, it was generated more than six months prior to the buccal swab being taken from defendant and then immediately run against a database of profiles (*see Williams*, 567 US at —, 132 S Ct at 2244 ["At the time of the testing, (the defendant) had not yet been identified as a suspect, and there is no suggestion that anyone at (the lab) had a sample of his DNA to swap in by malice or mistake. And given the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of (the defendant)"]). Here, there was no known DNA sample to "swap in" and no chance that "shoddy lab work" created a profile that would by coincidence match the sample taken from defendant months later. Nor could any "bias" have affected the compilation of the DNA profiles.

## Accusation by Direct Link to the Crime

As to whether the report at issue accuses the defendant by directly linking him to the crime, the majority notes that "[t]he fact that defendant's DNA profile was found on the gun was established by testimonial hearsay in the laboratory report" (majority op at 308-309). This is not accurate. As was the case in *Brown* and *Meekins*, the DNA profile did not "accuse[ ] . . . defendant by directly linking him . . . to the crime" (*Brown*, 13 NY3d at 340). Rather, as in *Brown*, the People called the expert "who conducted the actual analysis at issue, linking defendant's DNA to the profile" produced by the laboratory from the evidence linked to the crime (*id.*). The presence of defendant's DNA on the gun was established in the exact manner as with the rape kit DNA profile in *Brown* (*see Rawlins*, 10 NY3d at 160 ["It was left to the testifying witness . . . to draw the

inference from the evidence that (the) defendant's DNA profile matched those obtained from the rape kit"]; *see also Williams*, 567 US at —, 132 S Ct at 2228 [lab report at issue was not "inherently inculpatory"]).

Similarly, the DNA profiles here are not inherently accusatory[3] nor were they offered to prove an essential element of the crimes with which defendant was charged. Instead, as noted above, the reports contained data, graphs, and charts that did not accuse defendant of any criminal wrongdoing. It was not until Huyck made her critical analysis, opining that defendant's DNA exemplar matched the DNA taken from the gun, that any accusation was made tending to prove that defendant possessed the gun.

Proper application of our four-part "primary purpose" test clearly establishes that the DNA profiles entered into evidence here, like the DNA profiles admitted into evidence in *Brown* and *Meekins*, were not testimonial. Accordingly, no Sixth Amendment violation occurred.

## IV.

If we find that the DNA profiles themselves are testimonial, that constitutional violation could not be cured by Huyck—the analysts must testify. Whether Huyck provided the critical link between the DNA profiles or improperly relied upon the work of others is a separate issue.

The majority, however, after concluding that the DNA profiles are testimonial, goes on to fault the Huyck testimony, analogizing her role to the witness in *Bullcoming*. In that case the report concluded that the defendant had the offending BAC and the issue was whether the testifying witness had reached an independent opinion as to that fact. The analogy to this case would be the DNA comparison reports or evaluations—but those were initialed by Huyck as "Interpreting Analyst" and so admission of the reports was harmless (*see* n 3, *supra*).

---

**3.** To the extent the material at issue documents the match between the DNA profile developed from the buccal swab and that developed from the gun swabs, introduction of those reports was harmless as Huyck, who performed that comparison and is listed on those documents, testified in court (*see Rawlins*, 10 NY3d at 160 [the People relied on court witness to prove the DNA match making admission of notification of match as a business record harmless beyond a reasonable doubt]; *see also id.* at 157 [admission of testimonial fingerprint comparison report harmless in that testifying expert reached the same conclusion after comparing the latent prints]).

As to the comparison—or accusation—there is no distinction in the record between the testimony in *Brown* and this case. Huyck provided the critical comparison of the lab-generated DNA profiles.

In *Brown,* the forensic biologist/criminalist "compared [the] defendant's DNA characteristics to the specimen from the victim's rape kit," which was prepared by Bode, the independent laboratory, and, "[b]ased upon this analysis, she determined that the profiles were a match occurring in one out of one trillion males" (13 NY3d at 336). The witness, who clearly was not involved in the process of producing the profile created by Bode, stated "that she drew her own scientific conclusions from analyzing the data and [the] defendant's DNA profile" (*id.* at 337).

There is no support for the suggestion that the OCME forensic biologist/criminalist in *Brown* performed a more active review of the underlying materials than Huyck did here. In this case, as in *Brown,* Huyck examined the data in the file and the DNA profiles in reaching her "independent" conclusion that the profiles matched. Contrary to the majority's assertion, Huyck did not simply "parrot" other analysts' findings (majority op at 309). Rather, like the forensic biologist/criminalist in *Brown,* Huyck testified that she personally examined the OCME file, she interpreted the data represented in the machine-generated graphs, and she made the critical determination linking defendant to the gun. Huyck signed the Laboratory Report concerning the gun swabs, dated February 16, 2010, as the Analyst. The DNA Profile Evaluation Form prepared at approximately the same time lists Huyck as both the preparer and the Interpreting Analyst. Huyck was also the Interpreting Analyst on the DNA Profile Evaluation Form prepared for the buccal swab results. With respect to the testifying witnesses' roles in the process and review, the facts in *Brown* are indistinguishable from this case. Indeed, from the record described above it appears Huyck played a more active role here than did the testifying witness in *Brown* (*see* Part I, *supra* at 316-319). Huyck provided the critical analysis linking the two DNA profiles in the exact manner done in *Brown* and *Pealer* and to conclude otherwise is to ignore the substantial record evidence documenting her role.

## V.

In abandoning the reasoning of this Court's precedent, the majority now fashions a new rule: "where the laboratory report

is testimonial in nature . . . at least one analyst with the requisite personal knowledge must testify" (majority op at 313, citing *Williams*, 567 US at — n 4, 132 S Ct at 2273 n 4 [Kagan, J., dissenting]). The majority notes, however, that "an 'all analysts' rule is not consistent with the decisional law" (*id.* at 312) and instead seeks to parse the scientific process that generated the profiles in search of what is most "testimonial."

The majority, on this record, comes to the remarkable conclusion that "it is the generated numerical identifiers and the calling of the alleles at the final stage of the DNA typing that effectively accuses defendant of his role in the crime charged" (*id.* at 313). That is, the final stage in creating a neutral DNA profile, consisting of a series of numbers describing the DNA alleles found at a person's loci, at a time when the laboratory was not in possession of defendant's DNA, "effectively accuse[d]" him of possessing the gun (*id.*). The majority so concludes despite the "limited" record concerning "the importance of any one analyst or any one step in the actual DNA typing process" (*id.*). Thus, without record or other support, the majority holds that "an analyst who witnessed, performed or supervised the generation of defendant's DNA profile, or who used his or her independent analysis on the raw data . . . must be available to testify" (*id.* at 315).[4]

The majority further holds, again on this record, that "the analysts involved in the preliminary testing stages, specifically, the extraction, quantitation or amplification stages," need not testify (*id.* at 313). The majority invites "OCME or a laboratory that uses a similar multiple-analyst model [to] adapt its operation so that a single analyst is qualified to testify as to the DNA profile testing" (*id.*).

This rule, tied to no specific material entered into evidence, must be grounded in Huyck's testimony, the loose pages of the OCME file, and an amicus brief. It is fatally flawed for three reasons.

First, based upon the constitutional analysis performed by the majority, there is no basis to excuse analysts involved in "preliminary testing stages" from cross-examination at trial (*id.*). The majority has concluded the DNA profiles were testimonial. Analysts at each stage were involved in creating

---

4. There is some ambiguity as to what is meant by "defendant's DNA profile," but it appears intended to be both the profile from the buccal swab and the one generated from the gun swabs.

each offending DNA profile. Certainly, the amicus brief cited by the majority (*see id.* at 311-312 n 7) provides a corresponding constitutional violation for each stage of the process (*see also Williams*, 567 US at —, 132 S Ct at 2247 [Breyer, J., concurring] ["*amici* argue that the technicians at each stage of the process should be subject to cross-examination"], citing amicus brief of the Innocence Network).

Rather, the majority's artificial bright-line rule is the hedging on the extension into this area of the Supreme Court's Sixth Amendment cases anticipated and criticized by Justice Breyer in his concurring opinion in *Williams* (*see* 567 US at —, 132 S Ct at 2246 [Breyer, J., concurring] [noting that the dissent would have the prosecution produce "one or more experts who wrote or otherwise produced the report" and warning that "(o)nce one abandons the traditional rule, there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call *all* of the laboratory experts who did so"]).

It is not hard to understand why the majority has crafted this arbitrary rule that falls short of addressing what it has identified as a violation of defendant's Sixth Amendment rights. Requiring all analysts to testify at trials involving DNA evidence—at least in large metropolitan areas—would wreak havoc on the criminal justice system and forensic evidence laboratories like OCME (*see* 567 US at —, 132 S Ct at 2228). The majority's attempt to compromise creates confusion by implicitly abandoning our Confrontation Clause analysis in DNA—and other forensic evidence—cases while fashioning a rule that fails to abide by its own interpretation of the Confrontation Clause.[5]

---

**5.** It is unclear whether an autopsy report such as that admitted in *Freycinet* would now pass constitutional muster given that a medical examiner's office will perform the procedure and a murder suspect may have been identified. The majority attempts to cast this concern as "misplaced," stating: "We are not retreating from our prior decisions holding that, given the primary purpose of a medical examiner in conducting autopsies, such redacted reports—'a contemporaneous, objective account of observable facts that [do] not link the commission of the crime to a particular person'—are not testimonial" (majority op at 315, quoting *Pealer*, 20 NY3d at 454). This appears but one more attempt to find an arbitrary stopping place for that retreat and, as with other attempts to do so, cannot be squared with the constitutional analysis of the majority opinion or the language of our case law (*see Freycinet*, 11 NY3d at 42 ["a report of a doctor's findings at an

Next, despite the majority's contention that in *Meekins* and *Brown* "[o]ur sharpest focus was on the final stage of the DNA typing results, to wit, the generated DNA profile" (majority op at 310), there is no citation or support for this conclusion. In fact, in *Brown*, we noted that the analyst's use of the typing machine, presumably what the majority has in mind, contained "no conclusions, interpretations or comparisons . . . since the technicians' use of the typing machine would not have entailed any . . . subjective analysis" (13 NY3d at 340). For the most part, the distinction with respect to the "final stage" in creating the DNA profile is based upon substitution of the scientific terminology "alleles" and "electropherograms" for "graphs," "charts," and "strings of numbers." Indeed, the majority itself vacillates between this terminology without explaining any difference (*see* majority op at 300 ["an electropherogram . . . graphically depicts the peaks of the DNA analysis"]; *id.* at 302 [noting that Huyck testified that "the electropherogram was 'a fancy name for DNA results' and that the chart looked like 'a bunch of peaks,' with each peak representing 'one of the numbers' used to identify the alleles"]).

Lastly, the majority allows that, as an alternative to calling an actual witness to the generation of the profile, a witness may testify as to "his or her independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others" (*id.* at 315). That is, after finding that the DNA profiles themselves are testimonial, the majority would cure that violation by having a witness testify as to his or her "independent" analysis of the charts and graphs. In other words, a witness to do exactly what the majority concludes the witness did in *Brown*. Accordingly, regardless whether the DNA profiles are testimonial, after today's decision, the remedy is the same.

This clearly indicates that the "independent lab" and "known suspect" factors that apparently distinguish this case from *Brown* are of no moment—otherwise how could the issue be addressed in exactly the same way? What the majority is left with, despite its claim to the constitutional high ground, is the *Brown* standard for a testifying witness who conducts an "independent analysis on the raw data"—which apparently applies to OCME labs processing evidence of known suspects—

autopsy may reflect more exercise of judgment than the report of a DNA technician"]).

and a misreading of this record in concluding that no independent analysis occurred here. The DNA profiles, if testimonial, require the appearance of the witnesses who prepared them and this the majority is unprepared to say (*see* US Const 6th Amend; *Crawford*, 541 US at 68-69).

Rather, we should conclude, as we did in *Brown*, that defendant's Sixth Amendment right to confrontation was not violated. In the absence of Huyck's opinion, the reports of the other analysts, standing alone, shed no light on defendant's guilt. To the extent the lab material contained the reports linking the two DNA profiles, that error was made harmless by Huyck's in-court testimony. If defendant wished to explore further the reliability of the DNA testing performed in this case, he was free to subpoena any of the analysts and examine them at trial (*see Williams*, 567 US at —, 132 S Ct at 2228). He chose not to do so, despite the fact that he had pretrial access to Huyck. This Court's established precedent, applied correctly by the courts below, protected defendant's Sixth Amendment right to confrontation while allowing the criminal justice system to operate efficiently.

Instead of this analysis, we opt for the approach of Justice Kagan in the *Williams* dissent. If that position were to garner five votes in the Supreme Court of course we would be bound to follow. Until then, we are free to chart our own course based upon the Constitution, our case law, and common sense. At a time when the plurality in *Williams* signaled a desire to revisit *Melendez-Diaz* and *Bullcoming* (*see Williams*, 567 US at — n 13, 132 S Ct at 2242 n 13; *see also* 567 US at —, 132 S Ct at 2277 [Kagan, J., dissenting] [noting that "(t)hose decisions apparently no longer mean all that they say"]), we plunge ahead into greater confusion, creating a constitutional violation and recoiling from the consequences.

For the foregoing reasons, I dissent and would affirm the Appellate Division order.

Judges RIVERA, STEIN and FAHEY concur; Judge GARCIA dissents and votes to affirm in an opinion in which Judges PIGOTT and ABDUS-SALAAM concur.

Order reversed and a new trial ordered.