OPINION OF THE COURT
Elisa Koenderman, J.
The defendant is charged by indictment with robbery in the first degree (Penal Law § 160.15 [1]) and criminal possession of a weapon in the third degree (Penal Law § 265.02 [1]). The defendant moves pursuant to Criminal Procedure Law § 240.20 (1) (c) for discovery of the electronic raw data which yielded his DNA profile. The court initially denied the defendant’s motion. Upon reargument and reconsideration, however, the court grants the motion. Since the electronic raw data qualifies as a “written . . . document . . . concerning a . . . scientific test . . . made by, or at the request or direction of a public servant engaged in law enforcement activity” (CPL 240.20 [1] [c]), the People must disclose it.
The allegations are that on May 27, 2015, in a Dunkin’ Donuts in Queens County, an individual jumped over the counter while displaying a knife, removed $192 from the cash register and fled. Surveillance video captured the perpetrator knocking over the cash register touch screen with his hand during the incident. A New York Police Department (NYPD) officer swabbed the touch screen for biological evidence and submitted it to the Office of Chief Medical Examiner (OCME) Forensic Biology Department for DNA analysis. The OCME identified a mixture of DNA from at least three people, including one major male contributor. The OCME uploaded the 15 loci profile of the major male contributor to the New York State DNA Index System, which resulted in a match to the defendant’s “Convicted Offender” profile.
*905 The defendant specifically demands the electronic raw data generated by the capillary electrophoresis instrument prior to processing or analysis. He contends that the OCME is able to extract this data from its .fsa files and compile it into an electronic document. Moreover, he asserts that because the OCME performed the DNA analysis at the NYPD’s request, the People are bound to provide it.
The People oppose the defendant’s motion, alleging that the electronic raw data “is solely machine output,” “does not exist in any tangible readable form” and has “no discernable meaning.” They assert that in order to retrieve the electronic raw data, the “OCME would have to search its individual case files and extract the raw data from the individual separate batch files where it is stored in [their] computer system [and] mingled with raw data from countless other cases.” Next, the OCME would have to “compile [the] data for all of the different stages of the DNA testing process in this case.” Only then could the OCME provide the data “on some form of electronic media.”[1] In any event, the People argue that because the OCME is an independent agency outside their control, they have no obligation to produce the electronic raw data.
The electronic raw data is “a series of overlapping, jagged, intermixed multicolored peaks that have no labels or other values” (People’s response to defendant’s omnibus motion). Consequently, the OCME must process the electronic raw data through a software program[2] in order to interpret it. The software program produces an electropherogram which graphically depicts, along an x and y axis, distinct peaks of different colors with numerical labels indicating alleles and peak heights. To construct a DNA profile, an analyst reviews the electropherogram to decide whether to edit any additional *906 peaks as nongenetic material.[3] The analyst documents his edits on a table which denotes the location of the peak and reason for the edit.
The People maintain that they have complied with their discovery obligation by giving the defendant a copy of the entire OCME Forensic Biology Department file, including the electro-pherogram and edit table. The defendant counters that without the electronic raw data, he cannot adequately evaluate the DNA evidence. He states that the filters which the OCME sets for the software program affect how the peaks appear on the electropherogram.[4] Thus he contends that he cannot ascertain from the copy of the electropherogram the precise height, shape and location of unlabeled peaks which fall below the OCME filter threshold. Accordingly, the defendant avers that he intends to process the raw data through two different software programs[5] and that he may retain an expert.
A defendant’s right to discovery in a criminal case is statutory rather than constitutional (see Matter of Brown v Grosso, 285 AD2d 642, 643-644 [2d Dept 2001]; see also People v Colavito, 87 NY2d 423, 426-427 [1996]). By enacting the discovery statute, the legislature expressed its intent that a criminal trial “should not be a sporting event where each side remains ignorant of facts in the hands of the adversary until events unfold at trial” (People v Copicotto, 50 NY2d 222, 226 [1980]). Consequently, the discovery rules embody a philosophy of broad pretrial disclosure (see People v DaGata, 86 NY2d 40, 45 [1995]). This “enables [a] defendant to make a more informed plea decision, minimizes the tactical and often unfair advantage to one side, and increases to some degree the opportunity for an accurate determination of guilt or innocence” (Copicotto, 50 NY2d at 226). To that end, the discovery rules permit a defendant to view the prosecution’s evidence (see DaGata, 86 NY2d at 44).
*907 Pursuant to CPL 240.20 (1) (c), the People must produce on demand “[a]ny written . . . document . . . concerning a . . . scientific test . . . which was made by, or at the request or direction of a public servant engaged in law enforcement activity.” A “written document” “broadly covers all sorts of reports” (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 240.20 at 341 [2002 ed]) and includes, for example, a diagram of a rape victim’s vagina in her medical record (People v Powell, 205 AD2d 561, 562 [2d Dept 1994]). A written document also includes the computer source code for the Intoxilyzer 5000EN (People v Robinson, 53 AD3d 63, 68 [2d Dept 2008]). The source code is a “species of text” written onto a computer chip which contains the instructions the device follows in processing information and “concerns [the] scientific tests” it conducts {id. [internal quotation marks and citation omitted]).
Accordingly, a “written document” encompasses electronic data which contains information concerning a scientific test. This interpretation is consistent with the Penal Law definition of a “written instrument” as “any instrument or article, including computer data or a computer program, containing written or printed matter or the equivalent thereof, used for the purpose of reciting, embodying, conveying or recording information” (Penal Law § 170.00 [1]; see also Robinson, 53 AD3d at 69).[6]
Moreover, a “written document” is not limited to readable text.[7] Rather, any item which contains information concerning a scientific test, regardless of its form, may constitute a “written document.” Indeed, a diagram in a medical record is a “written document” but is not readable text (Powell, 205 AD2d at 562).
Additionally, a computer source code also is not readable text, but merely “a species of text” (Robinson, 53 AD3d at 68 [internal quotation marks omitted]). In fact, a source code is a *908 set of instructions written in programming language which a computer translates into object code and executes (see Microsoft Corp. v AT&T Corp., 550 US 437, 459 [2007, Alito, J., concurring]; Recent Case, Constitutional Law—Free Speech Clause—Sixth Circuit Classifies Computer Source Code as Protected Speech, 114 Harv L Rev 1813, 1813 n 1 [2001] [“(c)omputer ‘source code’ refers to a set of instructions written in a programming language. Before a computer can perform the instructions, they must be translated into object code, a binary representation of the source code, which a computer can directly execute” (internal citations omitted)]; John P Collins Jr, Speaking in Code, 106 Yale L J 2691 [1997]). Analogously, the DNA electronic raw data is not understandable until a software program processes it. Neither a computer source code nor the electronic raw data exists in a form which is readable without interpretation. Nevertheless, like the source code for the In-toxilyzer 5000EN, the electronic raw data embodies or conveys information concerning a scientific test. As such, the electronic raw data is as much a “written document” as the source code (see CPL 240.20 [1] [c]).
The defendant argues, and the People do not dispute, that determining “whether a certain peak represents an allele from one (1) person, alleles from more than one (1) person, or non-genetic information . . . requires human judgment where two (2) criminalists can reach different conclusions.” As the New York Court of Appeals has aptly observed,
“[w]e will not indulge in the science fiction that DNA evidence is merely machine-generated .... [T]he sophisticated software programs require trained analysts who engage in skilled interpretation of the data from the electrophoresis instrument, using the computer software with its color images, particularly as to the peaks in the graphs, to construct the DNA profile” (People v John, 27 NY3d 294, 311 [2016]).
Consequently, defense counsel and his experts should have the opportunity to evaluate this highly-technical evidence which is “open to interpretation given the rapid pace of advances in the development of this field” (DaGata, 86 NY2d at 44-45). Truly, “the best judge of the value of evidence to a defendant’s case is the single-minded devotion of counsel for the accused” (id. [internal quotation marks and citations omitted]). Because the electronic raw data is subject to interpretation by both the software program which processes it and the analyst who *909 constructs the DNA profile, the defendant cannot effectively challenge the DNA evidence without it.
Furthermore, because the OCME performed the DNA analysis at the NYPD’s request, the People must disclose the electronic raw data (see CPL 240.20 [1] [c]). The OCME is required by law to perform an autopsy under circumstances where homicide is suspected (see People v Washington, 86 NY2d 189, 192-193 [1995]). In fulfilling its statutory duty, the OCME functions as an independent agency outside the People’s control (see id.). Accordingly, the People are not obligated to provide a defendant with autopsy notes which they do not possess (see id.). In contrast, here the OCME was not mandated to perform the DNA analysis. It did so solely at the behest of the NYPD, which collected the biological evidence and submitted it for that purpose. The electronic raw data therefore is discoverable under the rule which permits the defendant to view the prosecution’s scientific evidence (see CPL 240.20 [1] [c]; see also DaGata, 86 NY2d at 45).
That the OCME must extract the raw electronic data from their computer storage files and compile it onto a computer disc in order to provide it in tangible form does not excuse the People’s obligation to produce it. Significantly, the OCME has the capability to reduce the information to an intelligible document (cf. Robinson, 53 AD3d at 73).
Accordingly, the People must produce the electronic raw data as a written document concerning a scientific test made at the request of law enforcement (see CPL 240.20 [1] [c]; see also DaGata, 86 NY2d at 44).

. The OCME confirms in a letter to the court that it is able to compile and transfer the raw electronic data stored in their .fsa files to a computer disc (see exhibit C annexed to defendant’s reply to People’s opposition to defendant’s motion to reargue).

. The OCME utilizes the GeneMapper program which applies three standard filters to the electronic raw data. The first filter is the “75 relative fluorescent unit” (RFU) threshold. This filter ensures that only peaks with a minimum height of 75 RFUs are labeled as alleles. The second is the “10% global filter.” This filter ensures that any peak which measures less than 10% of the highest peak at a particular locus is not labeled as an allele. The third filter is the stutter filter which ensures that any peak with a given percentage of RFUs at a predictable “stutter” position on the locus is not labeled as an allele. The stutter percentage varies depending on the locus.

. Nongenetic material, such as an artifact from the amplification process, noise from the capillary electrophoresis instrument, or a phenomenon known as stutter, may produce a peak on the electropherogram. When an analyst edits a peak, he removes its label as an allele.

. The defendant cites to John Butler, author oí Fundamentals of Forensic DNA Typing (1st ed 2009), as an expert who utilizes a peak detection threshold of 50, rather than 75, RFUs. In any event, the defendant argues that he requires the raw data to determine whether the OCME properly applied the standard filters.

. These software programs are: OSIRIS, a public domain program offered by the National Center for Biotechnology Information, and GeneMarker, a program manufactured by SoftGenetics, LLC.

. Courts have construed Penal Law § 170.00 (1) broadly to hold that a “written instrument” includes a transit MetroCard (People v Owens, 12 Misc 3d 600, 601-602 [Sup Ct, Bronx County 2006]), a cable converter box containing computer data (People v Grant, 185 Misc 2d 512, 515 [Sup Ct, Bronx County 2000]), a computer program in a cellular telephone (People v Lawrence, 169 Misc 2d 752, 754-755 [Sup Ct, Kings County 1996]) and a cellular telephone containing computer chips (People v Pena, 169 Misc 2d 366, 371 [Sup Ct, Bronx County 1996]).

. The court declines to follow People v Mohammed (52 Misc 3d 242, 243 [Sup Ct, Bronx County 2016]), by which it is not bound.