OPINION OF THE COURT
Jeanette Rodriguez-Morick, J.
At issue before the court is whether the People are obligated to obtain and produce the raw electronic data from which the DNA profiles in this case were generated.[1]
Defendant moves, under CPL 240.20 (1) (c) and (h), for disclosure of the raw electronic data underlying the DNA testing.
The People oppose defendant’s motion arguing, primarily, that (1) raw electronic data does not constitute a “written report or document” such that discovery would be compelled by CPL 240.20 (1) (c); (2) the People do not possess and therefore have no obligation to obtain and disclose the raw electronic data; and (3) this court has no authority to direct the Office of Chief Medical Examiner (OCME) to create a CD containing the raw electronic data files because such an order, in effect, compels the creation of pretrial evidence and discovery, an ultra vires judicial function.
For the reasons that follow, defendant’s motion is granted.[2]
Background
The defendant here, Frederick Jones, is charged with, among other crimes, possession of a loaded firearm (Penal Law § 265.03). He and his two companions were seated in a car from which the police recovered a gun.[3] That gun was submitted to the Office of Chief Medical Examiner, Department of Forensic Biology, for DNA testing. The OCME identified a mixture *745 of DNA from three people and, having obtained a DNA sample from defendant, determined that he was a possible contributor to the DNA mixture found on the gun.
On November 9, 2016, this court held a hearing to gain an understanding of the nature of raw electronic data, how it is collected, its use in the development of the DNA profiles in this case, and the ease or not of its retrieval.[4] Based upon the testimony of Elizabeth Lee, an OCME criminalist, the following facts were established.
When evidentiary material, such as the gun here, is swabbed for the possible presence of biological material capable of yielding DNA, the police provide the swabs to OCME and request that its Department of Forensic Biology test and analyze the swabbed materials (see Arthur aff at 3 f 4). In this case, the People also moved for an order, pursuant to CPL 240.40 (2) (b) (v), compelling defendant to provide a saliva sample that, once provided, was submitted by the People to OCME’s Department of Forensic Biology for comparison against the DNA profiles generated from the biological material obtained from the gun (People v Jones, Bronx County, Sept. 14, 2015, Rodriguez-Morick, J., indictment No. 2118-2014 [granting People’s motion to compel buccal swab]).
If DNA is detected in the biological material recovered, the DNA is extracted, quantified, and amplified. Defendant’s saliva sample, obtained via the buccal swab, goes through the same process. As relevant here, electrophoresis, the next step of DNA testing, is a data collection process during which the DNA fragments are “run” through an “instrument”—in this case, the 3130 Genetic Analyzer. As the DNA fragments travel through capillaries or tubes, the instrument collects information from the DNA fragments such as the fragments’ allelic ranges and separates alleles according to size. This information is what comprises, in part, raw electronic data captured in a unique *.fsa file, which file is created by the 3130 Genetic Analyzer software.[5] The *.fsa file or the raw electronic data is then *746 uploaded into a software program, Gene Mapper, which in turn, generates an electropherogram—the basis for any DNA profile.
To save time, several DNA samples from different cases are tested and analyzed all at once and travel together during each of the stages of DNA testing and analysis. The entire batch of DNA samples analyzed in this way is called a “run” and may include up to 96 DNA samples. Once these DNA samples are analyzed by the gene-analyzing instrument, the entire run of resulting *.fsa files is stored in a single folder and assigned a unique folder name. This run folder is saved on OCME’s network drive and named after the gene-analyzing instrument used and year and month in which the run was completed.
Each run folder contains not only the individual DNA samples that were run together but also contains the extraction negative control and the amplification positive and negative controls that were used during DNA testing and analysis for the entire run. Just as each DNA sample has its own unique *.fsa file name, so too do each of the controls.
As relevant here, positive and negative controls are used to prevent one DNA sample from contaminating another and to ensure testing accuracy. A positive control is essentially a test sample engineered to yield a specific, known result when OCME’s equipment is working properly. A negative control, on the other hand, is also a test sample but one that, in uncontaminated conditions, will contain no alleles or other indicia of DNA, the presence of which would indicate cross-contamination among the samples of a run. Whatever controls are used in a run are preserved and stored in the same run folder in which the individual DNA sample *.fsa files are stored. All together, these files constitute raw electronic data. (See hearing tr at 15, lines 14-18; at 18, lines 2-22; at 45, lines 16-18.)
The long and short of this is that the raw electronic data— that is, each of the individual DNA sample and control *.fsa files—is highly organized on OCME’s network drive. Retrieving this data requires going through a three-step process of searching for the following: (1) a folder name reflecting the gene-analyzing instrument used plus the date of the run; (2) within that folder, the relevant individual sample files, i.e., the unique *.fsa file(s) for the individual DNA sample(s) relevant to a case; and (3) the *.fsa files for each of the controls used. *747 Once the appropriate *.fsa files are identified, they are copied onto a CD that first has to be formatted. Formatting a CD may take up to 45 minutes.
Analysis
Raw Electronic Data is Discovery Material under Article 240
The statutory text of CPL 240.20, the statutory framework of article 240, its legislative history, and Court of Appeals precedent all support treating raw electronic data as discovery material under CPL 240.20.[6]
Section 240.20 of the Criminal Procedure Law requires a prosecutor to disclose to a defendant certain “property” including “[a]ny written report or document, or portion thereof, concerning a . . . scientific test . . . relating to the criminal action . . . which was made by, or at the request or direction of a public servant engaged in law enforcement activity” (see CPL 240.20 [1] [c]).
In the article’s definition of terms, the legislature defined “property” as “including, but not limited to” a catalogue of things set forth under that subdivision (CPL 240.10 [3]). That catalogue does not include “raw electronic data.” Yet, in ordinary English, use of the verb “include” signals that the list of items is a non-exhaustive, exemplary one and therefore items of discovery may include “property” not expressly listed.
Not only does use of the term “include” support a broad rather than a narrow reading, article 240’s statutory framework supports an expansive interpretation as well.
The language of CPL 240.20 (1) (f), for example, mandates disclosure so as to permit a defendant to conduct his or her own testing on evidentiary material (see e.g. People v Metivier, 210 AD2d 260, 261 [2d Dept 1994] [noting trial court’s error in denying defendant’s “pretrial discovery request ... to conduct independent testing of the drugs which were the subject of his *748 conviction”], citing CPL 240.20 [1] [f] [providing for discovery of any property obtained from the defendant]).[7]
Section 240.40 (1) (c), to take another example, permits a trial court to order discovery “with respect to any other property” so long as such discovery is, inter alia, “material to the preparation of his or her defense, and . . . the request . . . reasonable.”[8]
And the Court of Appeals has previously expressed an expansive view of discovery (see e.g. People v Colavito, 87 NY2d 423, 428 [1996] [noting that a defendant may move the court for an order, under CPL 240.40 (1) (c), directing the disclosure of items to be produced in the court’s discretion]; see also People v DaGata, 86 NY2d 40, 44-45 [1995] [mandating discovery under CPL 240.20 (1) (c) of FBI laboratory notes generated in connection with DNA testing and noting its ruling as “consistent with this State’s philosophy of broad pretrial disclosure”]; People v Copicotto, 50 NY2d 222, 226 [1980] [“Broader pretrial discovery enables the defendant to make a more informed plea decision, minimizes the tactical and often unfair advantage to one side, and increases to some degree the opportunity for an accurate determination of guilt or innocence” (citation omitted)]).
*749 The People argue against this broad construction, point to the limiting words “written report or document” (CPL 240.20 [1] [c]), and instead adopt a narrow view of the statute’s breadth based, in large part, on the oft-quoted statement in Colavito that “[i]terns not enumerated in article 240 are not discoverable as a matter of right unless constitutionally or otherwise specially mandated” (aff in opp at 9, quoting Colavito, 87 NY2d at 427).
However, all that can be said of Colavito, without diminishing or expanding its holding, is that it made understandable the distinction between evidentiary material and discovery material. An ex-deputy sheriff, Colavito was convicted of grand larceny and related charges because he misappropriated checks, made them out to “Postmaster,” and purchased money orders which he then used for personal expenses. The actual money orders that defendant purchased were not produced before trial because the prosecution had not obtained them until after the trial was already underway. Defendant argued in favor of reversal because, in relevant part, the prosecution had violated CPL 240.20 in failing to obtain and disclose the money orders prior to trial.
Ruling against defendant, and writing for the majority of the court, the Honorable Joseph W. Bellacosa first noted that, historically, court-ordered discovery was not statutorily or constitutionally authorized (Colavito, 87 NY2d at 426); in 1979, however, the legislature prescribed a “detailed discovery regimen in New York embodied in article 240 of the Criminal Procedure Law” (id. at 427, citing Copicotto, 50 NY2d at 225; see also DaGata, 86 NY2d at 44).[9]
*750 This “detailed discovery regimen,” though, was not meant to impose a new obligation on the prosecution to obtain evidence or else be precluded. Evidentiary material that may or may not exist and has yet to be obtained by the People, if it ever will be, is not the same as discovery material under article 240. As noted by Judge Bellacosa, adopting Colavito’s arguments would mean requiring the prosecution to go out and “scour [ ] up all the potential evidence” (Colavito, 87 NY2d at 428), a holding that would contradict clear and long-standing authority (see e.g. People v Hayes, 17 NY3d 46, 51-52 [2011] [neither prosecution nor police required to obtain and disclose information from bystanders who made statements within earshot of sergeant]; People v Alvarez, 70 NY2d 375, 380-381 [1987] [police not required to obtain and preserve additional breath samples for later testing in intoxicated-driving case]; People v Reedy, 70 NY2d 826, 827 [1987] [prosecution not obligated to obtain and disclose “personal victim(’s)” account of attack]).
However, where the material sought is of a type contemplated by CPL 240.20, i.e., “property” as defined in CPL 240.10 (3), the People are obligated to disclose it to the defense when that material is in the prosecution’s possession, and, in some cases, even when it is not (see e.g. DaGata, 86 NY2d at 44 [holding FBI notes of DNA testing conducted at the People’s behest discoverable under CPL 240.20 (1) (c) and (2) despite the fact that the People purported not to possess or control the notes]; see also CPL 240.20 [2] [“The prosecutor shall make a diligent, good faith effort to . . . cause such property to be made available for discovery where it exists but is not within the prosecutor’s possession, custody or control; provided, that the prosecutor shall not be required to obtain by subpoena duces tecum demanded material which the defendant may thereby obtain”]).[10]
*751 Further, adopting the People’s position that discovery is limited to only written reports or documents requires this court to ignore all the enacted text focusing instead on just a subset of it (cf. McKinney’s Cons Laws of NY, Book 1, Statutes § 97 [“A statute or legislative act is to be construed as a whole, and all parts of an act are to be read and construed together to determine the legislative intent”]; id. § 92, Comment [“(N)o narrow construction of a statute may thwart the legislative design”]).
Here, raw electronic data constitutes “property,” i.e., discovery material, under CPL 240.20 (1) (c) because it constitutes a “portion” of a written report that
“concernís] a . . . scientific test [DNA testing by OCME] . . . relating to the criminal action [the instant case] . . . which was made by, or at the request or direction of a public servant engaged in law enforcement activity [in this case the New York City Police Department and the People].”
Because the Office of Chief Medical Examiner Performed the DNA Testing Done Here at the Behest of Law Enforcement, the Raw Electronic Data Falls within the Purview of CPL 240.20 (1) (c)
Relying on People v Washington (86 NY2d 189 [1995]), a case implicating the Rosario rule, the People argue that because they are not in actual possession of the raw electronic data and because OCME is not under their control, the People cannot be compelled to obtain and produce the raw electronic data from OCME.[11]
But the issue is not as simple as that, for the question of whether OCME serves law enforcement is not one given to static resolution. Rather, as aptly noted by the Honorable Elisa S. Koenderman in People v Gills (52 Misc 3d 903, 909 [Sup Ct, *752 Queens County 2016]), OCME “functions as an independent agency [and is therefore] outside the People’s control” when it fulfills its statutory mandate to perform an autopsy to determine the primary cause of death, e.g., criminal violence, disease, physical injury, or chemical agents, in the latter case of which “the autopsy permits [OCME] to obtain biological samples for testing in the laboratory, and to evaluate the effects of the chemical agents on vital organs” (Office of Chief Medical Examiner, Frequently Asked Questions, http:// wwwl.nyc.gov/site/ocme/about/faq.page [accessed Feb. 21, 2017]; see also Administrative Code of City of NY § 17-203 [vesting medical examiners with discretion to determine when an autopsy is necessary]; NY City Charter § 557 [f] [1] [autopsies involving deaths caused “in any suspicious or unusual manner”]).
On the other hand, when OCME tests and analyzes DNA evidence at the request of law enforcement, it does so “with the primary . . . purpose of proving a particular fact in a criminal proceeding—that defendant possessed the gun and committed the crime for which he was charged” (People v John, 27 NY3d 294, 307-308 [2016]). Thus, though it has been held that the “duties of OCME are, by law, independent of and not subject to the control of the office of the prosecutor, and that OCME is not a law enforcement agency” when performing autopsies (Washington, 86 NY2d at 192), it has not been so held for all time and all purposes (see John, 27 NY3d at 308 n 5 [noting, in the Confrontation Clause context, that the “predominant purpose of OCME’s Forensic Biology Department is to provide DNA testing on crime scene evidence for the New York City Police and prosecutors”]). Here, the New York City Police Department and the People submitted biological material to OCME’s Forensic Biology Department and requested DNA testing and analysis for the purpose of determining whether, as law enforcement suspected, defendant had handled the firearm recovered in this case.
“The electronic raw data therefore is discoverable under the rule which permits the defendant to view the prosecution’s scientific evidence” (Gills, 52 Misc 3d at 909, citing CPL 240.20 [1] [c], and DaGata, 86 NY2d at 45; see also Peter Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 240.10 at 216 [1993 ed] [recognizing a distinction between the “concept of ‘discovery’—which is focused upon the right to a pre-trial probing of the evidence one’s opponent plans *753 to use—and related (constitutional) disclosure requirements,” such as those mandated by People v Rosario (9 NY2d 286 [1961])]).
Obtaining and Disclosing Raw Electronic Data is Not Unduly Burdensome
Nowhere in section 240.20 of the Criminal Procedure Law did the legislature exempt from the statute’s ambit materials that are too burdensome to produce (see id., passim). Rather, as the Court of Appeals has made abundantly clear, “section 240.20 is generally construed as a mandatory directive, compelling the People to provide the items when sought by the defendant” (DaGata, 86 NY2d at 44 [emphasis added]). The issue of burdensomeness, then, is not considered by the court unless and until the party from whom discovery is sought moves for a protective order pursuant to CPL 240.50 (1), which, though it does not expressly authorize trial courts to deny burdensome discovery requests, permits the regulation of discovery based on “any . . . factor or set of factors which outweighs the usefulness of the discovery.”
Here, the People make no such motion nor do they explicitly contend that OCME would be unduly burdened if the court were to compel production of the electronic raw data. Instead, this argument was made obliquely in the opposition papers and at the hearing (see e.g. aff in opp at 4-6 [detailing, at length, the steps an OCME criminalist must take to produce the raw electronic data]; aff in opp to subpoena motion at 21 n 12 [asserting that OCME counsel’s testimony before a different court, including her likening the process of retrieving and providing the *.fsa files to “pulling a card from a deck of cards,” was a “gross . . . oversimplifi(cation) (of) the process”]; hearing tr at 17, lines 3-7, 14-17 [“(S)ince the . . . case files . . . often . . . contain multiple runs of sometimes multiple samples, (the assigned criminalist) would have to go in and basically find all the individual FSA files for all the samples that were run that were associated with this case . . . (and) also (locate) the FSA files for the controls that were associated with that run”]).
In another unrelated case (cited by the People), a court of concurrent jurisdiction determined, based in part on an OCME criminalist’s affidavit, that the “process of identifying and compiling the raw data may take several hours to complete” (People v Mohammed, 52 Misc 3d 242, 244 [Sup Ct, Bronx County 2016]).
*754 The OCME criminalist who testified before this court, however, stated only that the process of finding the relevant files on OCME’s network is a simple three-step process that appears to be as difficult as locating any files on any large network server, that is, not difficult at all. The OCME criminalist here also testified that it could take up to 45 minutes to format a CD-ROM disc onto which the *.fsa files are recorded but that she could perform other work during that 45-minute process (hearing tr at 27, lines 7-9; at 28, lines 20-22). Thus, although several discs may be required for distribution to all necessary parties in a pending criminal proceeding (hearing tr at 27, lines 22-25), the amount of time that an OCME criminalist (or any other OCME employee) must actively spend compiling and burning the raw electronic data to a disc appears to be minimal.
Given the absence of any evidence demonstrating that an OCME criminalist would be required to spend several active hours devoted solely to assembling the *.fsa file(s) and burning them onto compact discs, the court finds that production of this type of discovery outweighs any real or imagined burden. This is especially true considering that DNA testing and analysis is “highly technical [in] nature” and that it is possibly “open to interpretation given the rapid pace of advances in the development of this field” (DaGata, 86 NY2d at 44).
Further, while the People argue that raw electronic data is useless to defense counsel and causing such property to be made available is futile, it is simply not for the People, nor for this court, to decide whether defense counsel can make any use of such property (see DaGata, 86 NY2d at 44-45 [“(T)his evidence . . . should be subject to the evaluation and strategy of defendant’s counsel and experts. We have often repeated that the best judge of the value of evidence to a defendant’s case is ‘the single-minded devotion of counsel for the accused’ ”], quoting People v Baghai-Kermani, 84 NY2d 525, 531 [1994] [recognizing that “weighing the potential impeachment value of the withheld material (is) an exercise best left to the single-minded devotion of counsel for the accused” (internal quotation marks omitted)]).[12]
*755 Under Article 240, Courts Have the Power to Compel the Disclosure of Article 240 Materials or Cause Such Property to be Made Available
The People next argue that requiring OCME to ferret and record onto a CD the *.fsa files is tantamount to directing the People to “create discoverable evidence” and that any such exercise of power by the court is ultra vires.
Not only is this argument unavailing, it displays a failure to acknowledge or understand the distinction between evidentiary and discovery materials.
In Matter of Farrell v LaBuda (94 AD3d 1195, 1197 [3d Dept 2012]), the case upon which the People mistakenly rely, the Appellate Division granted a writ of prohibition under CPLR article 78 that forbade the lower court from directing the prosecution to conduct a fingerprint comparison. In other words, as already noted above, a court does not have the power to direct the People to “scour” and scrounge up evidence (see supra at 750).
But LaBuda’s holding is not contrary to the holding here because the court is not requiring OCME to perform a DNA comparison nor is OCME being required to perform its analysis in any particular way. Rather, the court is merely directing the People to cause OCME to retrieve and disclose data that has already been created, that was generated at the People’s request, and that will form the basis of expert documentary and testimonial evidence at trial.
Moreover, the contention that courts do not have the power to direct the production of discovery material is plainly incompatible with the People’s application in this and other cases for orders, pursuant to CPL 240.40 (2) (b) (v), compelling defendants to provide saliva samples for DNA testing—a directive that implicates a defendant’s Fourth Amendment rights (People v Addison, 51 Misc 3d 498, 499-501 [Sup Ct, Bronx County 2016, Rodriguez-Morick, J.]). If courts have the power to so compel a defendant, then, a fortiori, courts have the power to condition that order on the disclosure of any data yielded by testing (see CPL 240.50 [1] [authorizing the “court in which the criminal action is pending,” upon either a party’s request or *756 the court’s own initiative, to issue a protective order “denying, limiting, conditioning, delaying or regulating discovery . . . for good cause”]).
Because the court concludes that the materials here constitute properly demanded discovery (see supra at 751), the court need not address the People’s remaining arguments.
For all these reasons, defendant’s motion is granted.

. Although the parties use “electronic raw data” and “raw electronic data” interchangeably, this court subscribes to the American Bar Association’s use of “raw electronic data” (see e.g. ABA Standards for Criminal Justice: DNA Evidence standard 16-4.1 [a] [viii] [3d ed 2007]).

. On January 25, 2017, this court issued an order directing the People to obtain from the Office of Chief Medical Examiner the raw electronic data at issue here and ordered its disclosure. This decision sets forth the court’s reasoning.

. For purposes of this motion, the court accepts as true the facts asserted in the felony complaint.

. The People’s characterization of the court’s hearing on this issue as “unprecedented,” suggesting that the court has somehow exceeded its authority (aff in opp to subpoena motion at 3-4 ¶ 8), ignores the court’s power “to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it” (Judiciary Law § 2-b [3]).

. The .fsa extension is merely a file extension that indicates the file format, just as a .doc extension indicates that a file is in Microsoft Word *746 format or a .pdf extension indicates a portable document file. The asterisk simply stands in as a universal symbol for the unique identifier (file name) assigned to the individual .fsa file by the Genetic Analyzer software.

. This ruling is just another on one side of a major conflict among a multitude of state trial courts on this issue. On one side are those cases with which this ruling is in accord (People v Gills, 52 Misc 3d 903, 905 [Sup Ct, Queens County 2016]; People v DeJesus, Sup Ct, Bronx County, Jan. 26, 2015, Clancy, J., indictment No. 3834-2013; People v Grant, Sup Ct, Bronx County, June 12, 2014, Fabrizio, J., indictment No. 604-2013; People v Givens, Sup Ct, Bronx County, Feb. 25, 2014, Webber, J., indictment No. 348-2012). On the other side are all the rest (see People v Carter, 50 Misc 3d 1210[A], 2016 NY Slip Op 50067[U], *6-7 [Sup Ct, Queens County 2016] [cataloging cases involving contrary holdings]).

. Of course, People v Metivier and CPL 240.20 (1) (f) refer to defendant’s right to perform scientific tests and experiments on recovered evidentiary material, which material is not the kind sought here; defendant seeks, not the biological material recovered at the scene, but the data and information yielded by the performance of DNA testing on that biological material. But in this context, the treatment of discovery material as opposed to evidentiary material should not differ (see People v Freshley, 87 AD2d 104, 112 [1st Dept 1982] [“The rule is plain that where the prosecution is permitted to call a witness, expert or not, who testifies as to a fact in issue or a conclusion to be drawn, the defendant is entitled to examine the underlying data, the basis for the testimony”]). Providing to the defense the underlying data and information used by prosecution experts in their scientific experiments permits defense experts to replicate and therefore test any such scientific experiments and conclusions.

. The prosecution cites People v Beckham (142 AD3d 556 [2d Dept 2016]), a CPL 240.40 decision, for the specific proposition that raw electronic data is not discoverable because the court purportedly held that such data is not under the People’s control. However, in distinguishing Beckham, the Honorable Alvin Yearwood noted, in People v De La Rosa (Sup Ct, Bronx County, Nov. 29, 2016, Yearwood, J., indictment No. 1849-2015), that the Appellate Division in Beckham made no reference at all to raw electronic data nor to CPL 240.20 (1) (c). What the Appellate Division did hold was that discovery decisions implicating CPL 240.40 are entirely within a trial court’s discretion and that, at least under the circumstances in Beckham, the trial court had “providently exercised [that] discretion” (Beckham, 142 AD3d at 556).

. When the second comprehensive iteration of CPL 240.20 was enacted in 1979 (the first was in 1971), the legislature indicated that the bill represented a “significant expansion of discovery in criminal cases, and, most importantly, establishes for the first time discovery procedures which can be conducted by the parties themselves without the need of motion practice and court orders” (Mem of Senator Ronald B. Stafford, Bill Jacket, L 1979, ch 412, 1979 NY Legis Ann at 250). The bill jacket of the 1982 amendment reveals that the legislature sought an increased exchange of “documentary and testimonial information . . . and provides that such information will be exchanged without the need for a court review” (Governor’s Approval Mem, Bill Jacket, L 1982, ch 558, 1982 McKinney’s Session Laws of NY at 2618). The enactment of and subsequent amendments to this provision reflect an effort by degrees to “improve! ] the adversarial truth seeking process” (id.) by mandating broader and earlier access to discovery material (see e.g. CPL 240.20, as added by L 1979, ch 412, § 2, as amended by L 1982, ch 558, §§ 4, 5 [expanding CPL 240.20 (1) (c)-(d) to include materials “made by a person *750 whom the prosecutor intends to call as a witness at trial, or which the people intend to introduce at trial” and requiring, under subdivision (1) (f), the production of tapes and electronic recordings “irrespective of whether such recording was made during the course of the criminal transaction”], L 1983, ch 317, § 1, L 1984, ch 795, § 3 [adding a new subdivision (1) (e) to require production of any photograph, photocopy, or other reproduction relating to stolen property], L 1986, ch 514, § 8, L 1989, ch 536, § 1 [adding subdivision (1) (k) pertaining to Vehicle and Traffic Law cases and requiring that the People turn over written materials generated during physical examination or scientific tests]).

. The People concede that the demanded material is not obtainable by subpoena duces tecum (see aff in opp to subpoena motion, passim).

. The People asseverate that “the electronic raw data has already been provided to defendant through the OCME case files. The electronic raw data generated in association with the DNA testing performed in this case, referred to as ‘electropherograms[,’] is contained in the OCME case files” (aff in opp at 3). This is patently misleading because no electronic files whatsoever have been produced. Production of the forensic biology case file, which consists of printouts and other hard-copy materials, is simply not the equivalent of producing electronic or digital files.

. The late Judge Henry Friendly, in a case involving a discovery dispute, made the following observation, fitting here, that he was surprised
“at the Government’s willingness, not unique to this case, to imperil convictions hoped to be obtained after immense effort, *755 by cavilling over the delivery of such [material], whose admission would not add appreciably to the strength of the defense but whose erroneous exclusion might lie just beyond an appellate court’s power of rescue under the harmless error rule” (United States v Borelli, 336 F2d 376, 393 [2d Cir 1964]).