This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 97
The People &c.,
          Respondent,
        v.
Peter Austin,
          Appellant.

Mark W. Zeno, for appellant.
Matthew White, for respondent.

DiFIORE, Chief Judge:

The issue presented by this appeal is whether defendant's Sixth Amendment right to confrontation was violated by the introduction of DNA evidence through the testimony of a witness who had not performed, witnessed or supervised the generation of the DNA profiles.  We conclude that the

- 1 -

introduction of this hearsay evidence through surrogate testimony in order to prove an essential fact for a finding of guilt -- that defendant was the perpetrator of the burglaries at issue -- violated defendant's right to confront the witnesses against him.

Defendant was charged with three burglaries and several related offenses in connection with two separate incidents. In the June 2009 incident, defendant was alleged to have broken into a building that contained several stores connected through a common basement. He gained access through a rear door after the stores were closed, and unlawfully entered both a vacant office and a dry cleaning establishment inside the building. The dry cleaner had surveillance cameras that captured the incident and a copy of the surveillance video was played for the jury at trial. In addition, the police took swabs from streaks of blood that were observed on the building's outside rear door. Those swabs were vouchered and sent to the Office of the Chief Medical Examiner (OCME) for DNA blood analysis. After testing, which produced a DNA profile, the swabs were transferred to the New York Police Department's Kingsland Avenue facility for storage.

The second incident was a burglary that took place at a Classic Bed and Bath store in September 2009. The back door had been forced open after business hours and money and merchandise were taken. The police found a bloody receipt near the cash register. This receipt was likewise tested for DNA evidence by OCME. The testing produced a DNA profile, and the physical

evidence was then transferred to Kingsland for storage.  There was no video surveillance of this incident.

The numerical identifiers constituting the DNA profile generated from the biological evidence obtained at the scene of the June 2009 burglaries were uploaded by computer to CODIS (the Combined DNA Index System) and, on August 27, 2009, OCME was notified that there was a match between the DNA from the crime scene evidence and defendant's numerical DNA profile, which was stored in the state database.  In October 2009, the numerical identifiers constituting the DNA profile developed from the biological evidence from the September 2009 burglary were also linked to the DNA profile from the June 2009 burglaries.  As a result, the police issued an investigative card alerting police that the detectives in this investigation wanted to speak with defendant in the event of an arrest.  Defendant was later arrested in April 2010 and indicted.

As the People explained at trial, they opted not to introduce evidence of the "cold hit" from CODIS.  Rather, "[t]o make things easier for the trial[, the People] had the defendant re-swabbed and retested by the DNA lab so that . . . we'd only have to call the one person from the downstate DNA lab and not have to deal with somebody in Albany."  Upon a pretrial court order, and defendant's consent, a buccal swab was collected from defendant in July 2012.  The numerical identifiers from the DNA profile generated by OCME from that sample were compared to the

numerical identifiers from the DNA profiles generated from the evidence from the three 2009 burglaries.  The strings of numbers for the profiles were found to match on October 23, 2012 -- just prior to defendant's trial.

The People's only forensic witness at trial on the DNA evidence was an OCME Criminalist level III.  As the trial progressed, it became clear through a series of discussions that the basis for the criminalist's testimony was going to be his comparison of the strings of numbers derived from the DNA test results generated by other analysts -- the 2009 DNA test results and defendant's 2012 exemplar.  Defense counsel raised various objections throughout the course of the parties' discussions about the DNA evidence, including that the criminalist's testimony would violate Melendez-Diaz v Massachusetts (557 US 305 [2009]) because the People were trying to elicit testimony "from a witness that was not going to be called" and that the testimony was hearsay because it was "about what someone else did."  On occasion, counsel's attempts to expound upon his objections, including his Confrontation Clause argument, were frustrated by the court.

Defense counsel's objections did have some measure of success, however.  To be sure, none of the laboratory reports including the actual numerical identifiers of the DNA profiles generated, or physical evidence of the DNA was ultimately admitted into evidence.  Nonetheless, the criminalist was

permitted to testify in a general and conclusory manner to the DNA evidence without personal knowledge of many matters he asserted to be true -- including the DNA profile generated from defendant's post-accusatory 2012 buccal swab.

Indeed, the criminalist was permitted to testify, over defendant's repeated hearsay objections, and without having conducted, witnessed or supervised the generation of the DNA profiles, that the DNA profile generated from defendant's buccal swab was a match to the DNA profile generated from evidence found at the 2009 crime scenes. Specifically, the criminalist testified that he received the voucher containing defendant's 2012 buccal swab and that the accompanying examination notes both identified defendant by name and included the evidence unit number. When the prosecutor asked whether he had "analyze[d] the DNA profile in this particular case," the criminalist responded that he "reviewed the DNA profile." In response to the prosecutor's request for clarification as to what his review of the DNA profile entailed, the criminalist responded that he "looked at the DNA profile, the string of numbers, which is the DNA profile and compared it to [the profiles generated from the 2009 burglaries]. And I compared them to male donor A from each of those cases and I found that they were the same DNA profile."

Despite the fact that the laboratory reports containing the generation of the DNA profiles by nontestifying witnesses were not in evidence, the criminalist was permitted to read from

those files on the stand.  The quality of his direct testimony was such that the court asked the prosecutor: "How come everything that [the witness] said that actually happened in this case he had to read from something that is not in evidence?"  The court further stated that it did not "understand what it is that he did, and how he did it, or for that matter whether he did anything."

In contrast to the prosecutor's initial assertion that the criminalist was "the supervisor on the original test," the witness admitted on cross-examination that he neither performed, nor was present for, any of the testing on the September 2009 samples.  Moreover, although his name appears on some of the laboratory reports, which again were not in evidence, in connection with the June 2009 samples, he testified that he did not perform the laboratory testing on those samples.  Tellingly, during the criminalist's redirect testimony, when the prosecutor sought to question him about a document not in evidence, the court told the attorneys that "[y]ou guys have basically made this witness into a parrot.  He doesn't know anything.  He didn't do anything, but you use him to put in all of this other information, just as if I [sic] actually had knowledge of it."

During the trial, the parties discovered that the physical evidence that had been stored in the Kingsland facility had been rendered unavailable due to conditions caused by Hurricane Sandy.  Specifically, the facility could not be

accessed because it had been flooded with water that was contaminated by a nearby Superfund location.  The court denied defendant's request for an adverse inference charge based on the People's failure to preserve this evidence.  Notably, however, the absence of physical evidence at the trial was not limited to the effects of the hurricane.  Defendant's own 2012 exemplar, which was available at the trial, was not entered into evidence on defendant's objection, due to the People's failure to establish the necessary foundation for admission into evidence.

At the close of the People's case, defendant moved to dismiss the indictment, arguing that they had failed to establish a prima facie case given that there was "not one piece of DNA evidence actually in evidence."  The court denied the motion as to the June 2009 burglaries, noting that there was surveillance video from the dry cleaner.  However, the court reserved decision on the motion as it related to the September 2009 burglary, after observing both the criminalist's "questionable validity or status as a witness" and the fact that "there's really nothing that ties this defendant to the bath store other than the alleged DNA."  The court described the criminalist's testimony by saying that "[a]pparently, all he did was to review what other people did."

The jury found defendant guilty of two counts of burglary in the third degree and criminal mischief in the fourth degree relating to the June 2009 burglaries.  The jury acquitted him of the counts relating to the September 2009 burglary.  The

Appellate Division affirmed, with one Justice dissenting (134
AD3d 559 [1st Dept 2015]).  The dissenting Justice granted
defendant's application for leave to appeal to this Court, and we
now reverse.

Defendant on appeal limits his Confrontation Clause
challenge to the OCME witness's testimony concerning the DNA
profile created from his 2012 post-accusatory buccal swab and the
comparison between that profile and the DNA profiles generated
from the 2009 burglaries.  He maintains that this postindictment
evidence is testimonial, as it was created for the primary
purpose of identifying him as the perpetrator of the burglaries,
and that the testimony as to this evidence was inadmissible
hearsay.  We agree.

The Confrontation Clause generally prohibits the
admission of testimonial statements made by a nontestifying
witness against defendant at trial, unless the witness is
unavailable and defendant "'had a prior opportunity for cross-
examination'" (People v Pealer, 20 NY3d 447, 453 [2013], quoting
Crawford v Washington, 541 US 36, 53-54 [2004]).  Under the
primary purpose test for determining whether evidence is
testimonial, we have considered "'whether the statement was
prepared in a manner resembling ex parte examination and . . .
whether the statement accuses defendant of criminal wrongdoing'"
(Pealer, 20 NY3d at 453, quoting People v Rawlins, 10 NY3d 136,
156 [2008]).

The criminalist's hearsay testimony as to the 2012 DNA profile easily satisfies the primary purpose test. Our analysis has been different in cases where defendant was linked to the DNA from the crime scene from a cold hit before he was ever a suspect in the crime (see e.g. People v Brown, 13 NY3d 332, 340 [2009]). However, here, the People elected not to use the evidence of the pre-accusatory CODIS match because they wanted to avoid bringing a witness in from Albany to testify. Instead, the People relied solely on the evidence of the DNA profile generated from defendant's 2012 buccal swab, which was developed during the course of a pending criminal action and was created in order to prove his guilt at trial (see People v John, 27 NY3d 294, 308 [2016]). Stated differently, the buccal swab was obtained and the resulting profile was compared with the DNA profile generated from the 2009 burglaries, "with the primary (truly, the sole) purpose of proving a particular fact in a criminal proceeding -- that defendant . . . committed the crime for which he was charged" (27 NY3d at 307-308).

Thus, in order to satisfy the Confrontation Clause, defendant was entitled to cross-examine the analyst who either "performed, witnessed or supervised the generation of the critical numerical DNA profile" or who "used his or her independent analysis on the raw data" to arrive at his or her own conclusions (27 NY3d at 314, 315). As we recently held, "it is the generated numerical identifiers and the calling of the

alleles at the final stage of the DNA typing that effectively accuses defendant of his role in the crime charged" (27 NY3d at 313).  The trial transcript plainly establishes that the criminalist had no such role here.  Although the criminalist may have had some level of involvement in OCME's handling of some of the 2009 crime scene swabs, he had no role whatsoever in the testing of defendant's post-accusatory buccal swab.  His testimony was, therefore, merely "a conduit for the conclusions of others" (27 NY3d at 315).

On the whole, the criminalist's testimony was nothing more than a parroting of hearsay statements, made by other analysts and of which he had no personal knowledge.  There is no question that his testimony as to the findings and conclusions of the nontestifying witnesses was elicited in order to prove the truth of those extrajudicial assertions -- primarily, identifying defendant as the burglar.[*]  The People's claim that the facts presented here are meaningfully different from those presented in John because the laboratory reports that, alone, contained the numerical identifiers of the DNA profiles were not introduced

_____

[*] The concurrence, relying on the plurality opinion in Williams v Illinois (567 US 50 [2012]), attaches great significance to the "cold hit" -- which was not a matter in evidence -- arguing that it could have been used to link defendant to the crime scene.  As it was not in evidence, the characterization of the DNA profile generated from the 2012 buccal swab as merely "confirmatory" is erroneous.  Here, the People relied upon the 2012 post-accusatory DNA result generated by nontestifying analysts, for the primary purpose of establishing defendant's guilt at trial.

into evidence is meritless.  Indeed, this case is extraordinary given the dearth of DNA evidence presented at trial in any admissible form.  Moreover, the People failed to proffer any exception to the hearsay rule under New York law that would have allowed the criminalist to relay the content of the unadmitted laboratory reports (see People v Nieves, 67 NY2d 125, 131 [1986]).  For instance, there was no argument that the criminalist's hearsay testimony concerning the 2009 DNA profiles was offered not for its truth, but for the limited purpose of explaining how the criminalist reached his expert conclusion that the identical strings of numbers were obviously the same (see People v Goldstein, 6 NY3d 119, 127 [2005]).  As we explained in John, such expert opinion testimony of a comparison of numbers would likely be inadmissible in New York without establishing a proper foundation -- i.e., that defendant's DNA profile was obtained from the scene of the burglary and that the numerical profile was reliable and accurate in the first instance (27 NY3d at 306).

The error was not harmless, as the evidence of defendant's guilt without the DNA evidence was not overwhelming and there is a reasonable possibility that the error might have contributed to the verdict (see People v Crimmins, 36 NY2d 230, 237 [1975]).  In light of our holding, we do not address defendant's adverse inference argument.

Accordingly, the order of the Appellate Division should

be reversed and a new trial ordered.

People v Peter Austin

No. 97

GARCIA, J.(concurring):

On constraint of People v John (27 NY3d 294 [2016]), I agree with the majority that defendant's conviction must be reversed, and a new trial granted. Although the Supreme Court has declined to take this approach with respect to DNA evidence under the Confrontation Clause, this Court has made the "leap" (id. at 316 [Garcia, J., dissenting], citing Williams v Illinois, 567 US 50 [2012]), and the outcome here is an unfortunate but unavoidable result.

In Williams v Illinois, a plurality of the Supreme Court concluded that, where the reports relied on by the DNA expert were not admitted into evidence, the expert's testimony did not violate the Confrontation Clause, as "that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted" (567 US 50, 57-58 [2012]). Similarly, here, the DNA expert from the Office of the Medical Examiner (OCME) testified based on the content of laboratory reports, which were not admitted into evidence. But unlike the plurality in Williams, we hold today that this expert testimony violated the Confrontation Clause.

I agree with the majority that reversal is required by

- 1 -

our holding in John.  There, the Court considered whether the

defendant's rights were violated where the People introduced DNA

reports without producing a witness who conducted or witnessed

the laboratory's generation of the DNA profiles (John, 27 NY3d at

297).  Distinguishing Williams, the Court in John reasoned that,

unlike in Williams, the DNA laboratory reports were entered into

evidence, thereby creating a Confrontation Clause violation.  But

the Court's holding went further, concluding that a defendant is

entitled to confront at least one of the DNA analysts who

performed a step on one of the samples, thereby prohibiting a

testifying expert from relying on a report generated by others

(majority op at 9-10; see also John, 27 NY3d at 313; People v

Goldstein, 6 NY3d 119 [2005]).  Accordingly, while the procedure

used here -- an expert relying on work performed by others but

not admitted into evidence -- mirrors the facts of Williams, our

holding in John compels a different result.

The plurality in Williams alternatively held that, even

if the laboratory report had been admitted into evidence, there

would be no Confrontation Clause violation, in part because

"[t]he report was sought not for the purpose of obtaining

evidence to be used against [the defendant], who was not even

under suspicion at the time, but for the purpose of finding a

rapist who was on the loose" (567 US at 58).  As we noted in

John, the profiles in Williams "were generated from rape kits by

private laboratories when the suspect was unknown and the

defendant was later identified on a 'cold hit' from the CODIS database" (27 NY3d at 310).

The match in the instant case was, as in Williams, a classic "cold hit." Specifically, police recovered DNA from the first crime scene which, when run through the CODIS database, matched defendant's DNA profile (developed as a result of an earlier arrest on unrelated charges). DNA from the second crime scene was then linked to the DNA profile from the first crime scene. Accordingly, as in Williams, the original DNA profile that matched the crime scene evidence was created not with defendant in mind, but rather to ascertain who had committed the burglaries (see Williams, 567 US at 77 ["Without access to any other sample of petitioner's DNA (and recall that petitioner was not even under suspicion at this time), how could a dishonest lab technician have substituted petitioner's DNA profile?"]). Though the original CODIS match was not used at trial -- defendant objected to its admission -- a confirmatory sample of defendant's DNA profile, obtained by the People, was introduced.[1]

_____

[1] The majority asserts that "the People elected not to use the evidence of a CODIS match because they wanted to avoid bringing a witness in from Albany to testify" (majority op at 9). But defense counsel's on-the-record objection reveals the true reason behind the People's use of a confirmatory sample: defense counsel believed that, if the CODIS match was introduced, "the jury would infer . . . that [defendant] had a prior criminal history." Defendant therefore "submit[ted] to the DNA swab" in order to "avoid bringing up the fact that he had a prior conviction" and any accompanying "inference that he has a propensity to commit crimes."

Despite the resemblance to Williams, John again compels a different result.  In John, the Court rejected the defendant's argument that the DNA match was analogous to the "cold hit" in Williams (27 NY3d at 310 [also distinguishing, on this basis, People v Meekins, 10 NY3d 136 (2008) and People v Brown, 13 NY3d 332 (2009)]; see also id. at 329-330 [Garcia, J, dissenting]).  And again, the majority here indicates that the result might be "different" in the case of a "cold hit," where the defendant "was linked to the DNA from the crime scene . . . before he was ever a suspect in the crime" (majority op at 9).  But the confirmatory match in this case was a perfunctory measure, performed solely to replicate an earlier cold hit.  Indeed, the People could have introduced the CODIS cold hit, but -- in light of defendant's objection -- opted to obtain the confirmatory sample.  As we inch closer to a cold hit, the reach of John's holding casts increasing doubt on whether the majority's "cold hit" distinction survives (see People v John, 27 NY3d at 329 [Garcia, J., dissenting]).

The path we are on has "no logical stopping place" (Williams, 567 US at 89  [Breyer, J., concurring]).  Today we reverse a conviction, obtained prior to John, presenting circumstances much like those in Williams: (1) the OCME expert relied on reports not admitted into evidence, and (2) the match at issue was merely confirmatory, performed after a "cold hit"

already identified defendant.  Unless and until the Supreme Court

provides much-needed clarity on whether DNA reports "lie outside

the perimeter of the [Confrontation] Clause" (see Williams, 567

US at 99 [Breyer, J., concurring]), we have no choice but to

continue.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order reversed and a new trial ordered.  Opinion by Chief Judge
DiFiore.  Judges Rivera, Stein, Fahey, Wilson and Feinman concur.
Judge Garcia concurs in result in a separate concurring opinion.

Decided October 19, 2017